## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOMMEL PROPERTIES, LLC,** | : | **Civil Action No. 1:11-cv-2316** |
| **LAND OF BELIEVE FARM, INC.,** | : | |
| **WILLIAM J. DOMMEL, and** | : | **(Judge Conner)** |
| **ROBERT W. DOMMEL,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JONESTOWN BANK AND TRUST** | : | |
| **COMPANY,** *now known as* **JBT,** | : | |
| **LEBANON COUNTY TAX CLAIM** | : | |
| **BUREAU, and SALLIE A. NEUIN** | : | |

## MEMORANDUM

Presently before the court in the above-captioned matter are the motions to

dismiss of defendants Lebanon County Tax Claim Bureau and Sallie A. Neuin

(collectively, where appropriate, the "county defendants"), (Doc. 29), and defendant

Jonestown Bank and Trust Company, (Doc. 30). The motions are fully briefed, and

are ripe for disposition. For the reasons set forth below, the court will grant each

motion in part, and will deny each motion in part.

## I.    Factual Background

When ruling on a motion to dismiss under Rule 12(b)(6), the court must

"accept all factual allegations as true, construe the complaint in the light most

favorable to the plaintiff, and determine whether, under any reasonable reading of

the complaint, the plaintiff may be entitled to relief." Gelman v. State Farm Mut.

Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Phillips v. County of

Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)); see also Kanter v. Barella, 489 F.3d 170,

177 (3d Cir. 2007) (quoting <u>Evancho v. Fisher</u>, 423 F.3d 347, 350 (3d Cir. 2005)). Accordingly, the court will present the well-pleaded facts as set forth in the complaint.

Plaintiffs William J. Dommel and his father Robert W. Dommel reside in Palmyra and Drumore Pennsylvania, respectively. The Dommels engage in the horse breeding trade, through their businesses Land of Believe Farm, Inc., and Dommel Properties, LLC, both of which are also plaintiffs in the above-captioned matter. Plaintiffs filed the Complaint (Doc. 1) against defendants The Lebanon County Tax Claim Bureau (the "TCB"), a municipal agency located in Lebanon, Pennsylvania; Jonestown Bank (the "Bank"), a banking corporation located in Cleona, Pennsylvania; and Salle A. Neuin ("Neuin"), Director of the TCB and a member of the Board of Directors of the Bank.

A.      <u>The Dommel Properties and Promissory Notes</u>

Collectively, the Dommels have been in the commercial horse breeding business for over twenty-five years. Of relevance to this litigation are three properties currently or at one time owned by the Dommels. The first ("Farm One") is located in Palmyra, and consists of 96 acres of farmland, including 62 horse stalls in four barns, a pond, and a four bedroom home. The Land of Believe Farm ("Farm Two") is also located in Palmyra, and consists of 68 acres, upon which sit a two-story home and a number of horse barns and outbuildings. The Dommels live on Farm Two, where they board, breed, and foal thirty-five thoroughbred horses. Finally, the Dommels owned, but have sold, a property known as the "Hunting

2

Camp," in Lycoming County, that consisted of five hundred acres of hunting land. The Dommels sold this property in March 2010, for $575,000.

On March 26, 2006, the Dommels and Land of Believe Farm, Inc., executed a Demand Promissory Note with the Bank (the "First Note"). The First Note provided a $1.3 million line of credit to be used to expand the Dommels' horse breeding business, and was secured by a mortgage against Farm One and Farm Two. Dommel Properties LLC signed a Guaranty and Suretyship agreement, guaranteeing Land of Believe Farm, Inc.'s repayment of the First Note.

On January 23, 2007, the Dommels took out a construction loan with the Bank, in the amount of $2,425,000 (the "Second Note"). The Dommels intended to use this loan to finance construction on Farm Two. On the same day, Land of Believe Farm, Inc. and Dommel Properties LLC signed a Guaranty and Suretyship agreement, guarantying the Dommels' repayment of the Second Note, which was secured by a mortgage against Farm One and Farm Two.

On May 31, 2007, the Dommels secured a loan from the Bank in the amount of $605,000 (the "Third Note"). Land of Believe Farm, Inc. and Dommel Properties, LLC signed a Guaranty and Suretyship agreement, guaranteeing the Dommels' repayment of the Third Note. The Third Note was secured by a mortgage against the Hunting Camp.

According to the Complaint, at no time during the executions of the First, Second, or Third Notes did the Dommels have counsel present, nor were the agreements reviewed by counsel.

B.     Farm One

The Dommels listed Farm One for private sale in 2007, and received a bona fide offer of $4.5 million dollars, but a sale was never consummated.  The unsuccessful sale of Farm One, coupled with a lull in the market for thoroughbred horses brought on by the economic recession of recent years, put the Dommels into a financially precarious position.  Mr. Dommel[1] met with bank executives to express his concern about ongoing construction on Farm Two, given the failed sale of Farm One.  According to the Complaint, the Bank encouraged Mr. Dommel to continue with construction on Farm Two, notwithstanding his over-extended credit line, and "not to worry, we will work it out." (Doc. 1 at 6).

The Dommels saw a 50% decline in business in 2007, from breeding and boarding 80-90 horses prior to that year, to fewer than 50 horses after.  They were no longer able meet their monthly payment obligations to the Bank.  On October 10, 2008, the Bank confessed judgment against the Dommels in the amount of $1,520,827.33 on the First Note; $2,936,408.53 on the Second Note; and $716,424.24 on the Third Note.[2]

---

[1] The complaint is vague as to whether this was Robert or William Dommel.

[2] The Complaint contains a more detailed accounting of these figures, which combine the unpaid balances on the notes, late charges, interest, and attorney's fees.

Plaintiffs assert that Mr. Dommel met repeatedly with executives from the Bank throughout the fall and winter of 2008, during which time they repeatedly assured him that the Bank would continue to work with him to resolve the debts, notwithstanding the confessed judgments on the notes. Allegedly, the Bank also represented to Mr. Dommel that it would not execute upon the judgments.

The Dommels held a public auction for Farm One on August 21, 2008. The auction was attended by developers, horse breeders, and investors, numbering over 150. According to the Complaint, a Senior Vice President of the Bank announced at the podium that any offer was "contingent upon approval by the Bank's Board of Directors." (Id. at 8). Plaintiffs allege that this statement was made in an effort to chill the bidding. Farm One received a high bid of $1,815,000,[3] but the Bank rejected it, purportedly to avoid crediting the equity against the Dommels' debt, and to pave the way for the Bank's ownership of Farm One.

The Dommels had Farm One appraised in July 2008, and it was valued at $2.3 million. In June 2009, however, the Bank had its own appraiser assess Farm One, who devalued it by 46%. The Bank conducted a sheriff's sale of Farm One on July 23, 2009, "surreptitiously" purchasing the property for $11,053.31. Plaintiffs allege that the sheriff's sale was conducted to usurp the Dommels' property.

---

[3] Consisting of $1,650,000 plus a 10% buyer's premium.

On January 18, 2010, the Bank filed a petition to fix the fair market value of

Farm One.[4]  At a hearing on September 27, 2011, the court fixed the fair market

value of Farm One as $1.5 million, crediting the Dommels with this amount and any

accrued interest and legal fees.  According to plaintiffs' Complaint, the Bank has

not credited the $1.5 million against the Dommels' debt.

C.     Farm Two

Neuin is a member of the Bank's Board of Directors.  She is also the

Treasurer for Lebanon County and Director of the TCB.  She is married to the

Director Emeritus and former President of Jonestown Bank, Howard M. Neuin;

together, they are two of the Bank's largest shareholders.

Plaintiffs allege that Neuin, through her positions at the Bank and the TCB,

discovered confidential information related to the Dommels, the properties that

they owned, the value of their properties, and their businesses, collateral, and

clients.  According to plaintiffs' Complaint, Neuin was aware of the Dommels'

history with the bank, including their loan agreements and borrowing history, and

with their tax situation.  On May 25, 2011 and July 7, 2011, plaintiff Dommel

Properties LLC received a notice from the TCB stating that, due to delinquent real

estate taxes during tax year 2009, the TCB would hold a tax sale of Farm Two on

September 12, 2011.  Plaintiffs allege that notice of the sale for delinquent taxes was

not properly "posted."

---

[4] The Complaint does not specify in what court this petition was filed.

6

Throughout the spring and summer of 2011, the Dommels continued to meet with the Bank in an effort to negotiate a resolution to their outstanding debt. According to the Dommels, they were repeatedly assured by Bank executives that the Bank had no interest in taking Farm Two. The Complaint details one occasion in August 2011, when Mr. Dommel met with Bank Vice President Richard Rollman ("Rollman"). Rollman allegedly agreed to negotiate in good faith with the Dommels to reach a settlement proposal that could be taken to the Bank Board for approval. Rollman continued to assure Mr. Dommel that the Bank would not seize the farm. On September 9, 2011, three days before the tax sale, Mr. Dommel met with Roger Jeremiah ("Jeremiah"), Senior Vice President of the Bank, who assured Mr. Dommel that the bank would not bid on Farm Two. Mr. Dommel gave the Bank $5,000 as a good faith payment toward his outstanding debt. Mr. Dommel spoke to Rollman again on September 9, who again assured him that the Bank was not planning to bid on Farm Two.

On September 12, 2011, the TCB held the tax sale on Farm Two. The Dommels did not attend. According to the Complaint, notwithstanding their assurances to the contrary, the Bank "surreptitiously" purchased the property at an "upset price" of $110,401.95. (See Doc. 1 at 11). When Mr. Dommel called the TCB on September 13, 2011, to inquire as to the outcome of the sale, Neuin allegedly informed him "We own your property. You will be looking for a new place to live." (Id.) Mr. Dommel then spoke with Jeremiah, who advised him that the Bank

7

purchased the property because "it puts us . . . in a better position." (Id.) Mr. Dommel stopped payment on the $5,000 check that he wrote to the Bank.

In a letter dated September 28, 2011, the Bank contacted the Dommels' largest client, Thomas McClay. In the letter, the Bank stated that it was "the current owner of the property. The Bank understands that you are currently leasing the Property or have horses under a management/boarding agreement with the prior owner, William J. Dommel . . . . the Bank demands that any and all lease payments . . . be remitted directly to the Bank as the current owner of the Property." (Doc. 1 at 13).

## II.   **Procedural History**

The Dommels challenged the Tax Sale in the Lebanon County Court of Common Pleas. See _In re_ Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011, No. 2011-01738 (Lebanon County Court of Common Pleas). They filed objections and exceptions to the sale, alleging that: (1) the tax sale was void because the TCB failed to properly post Farm Two pursuant to Pennsylvania real estate law; (2) the sale violated the Dommels' substantive due process rights; (3) that the Bank and TCB conspired to destroy the Dommels' business through the tax sale; and (4) that the Bank's purchase of Farm Two was fraudulent, _inter alia_, because it was contrary to the Bank's prior representations to Mr. Dommel. (See Doc. 35 at 7). The Court of Common Pleas held a hearing on June 11, 2012, at which it addressed "the September 2011 Tax Sale, and the dealings between Tax [_sic_] Claim Bureau,

the bank, and the objectors [plaintiffs]" with regard to the sale of Farm Two.  (See Doc. 31-1 at 11).

On August 17, 2012, the Court of Common Pleas overruled the Dommels' objections and exceptions to the tax sale, ruling against them on the merits of their claim that the TCB failed to provide statutorily required notices, and declining to consider the Dommels' second, third, and fourth claims.  The court stated that "the only issues that are cognizable on exceptions or objections to a tax sale are whether the [TCB] complied with the procedures required by statute," and that while the Dommels' other arguments "may present a cognizable basis for legal action in other proceedings before this and/or other courts or tribunals, . . . [they do not] present an actionable objection or exception to a tax sale."  *In re* Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011, No. 2011-01738, slip op. at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41-1).  Plaintiffs noticed their appeal to the Commonwealth Court on August 24, 2012, and submitted an emergency application for supersedeas on September 4, 2012.  The court denied the application for supersedeas on September 26, 2012, and the matter was discontinued on November 15, 2012.  See Dommel Properties v. Lebanon Co. Tax Claim Bureau, No. 1621-CD-2012 (Pa. Commw. Ct. Nov. 16, 2012).

On February 7, 2012, Dommel Properties LLC filed a Chapter 11 Voluntary Bankruptcy Petition in the Bankruptcy Court for the Middle District of Pennsylvania.  *In re* Dommel Properties LLC, No. 1-12-691 (M.D. Pa. Bankr.).  On April 3, 2012, the Bankruptcy Court entered an order lifting the automatic stay, see

9

11 U.S.C. § 362(a), allowing "the parties to pursue the Federal Litigation to judgment, including any ancillary injunctive relief." See _In re_ Dommel Properties LLC, No. 1:12-691 (M.D. Pa. Bankr. April 3, 2012).

Plaintiffs bring eleven claims, alleging violations of their procedural and substantive due process rights under § 1983 (Count I); federal inverse condemnation under 40 U.S.C. § 3113 (Count II); state inverse condemnation (Count III); civil conspiracy (Count IV); intentional interference with contract (Count V); conversion (Count VI); fraud (Count VII); negligence (Count VIII); breach of fiduciary duty (Count IX); promissory estoppel (Count X); and deepening insolvency (Count XI). Plaintiffs seek compensatory and punitive damages, and attorney's fees.

### III.　Jurisdiction and Standard of Review

Jurisdiction in this case is premised on the court's power to decide questions of federal law. District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The court has supplemental jurisdiction to decide state law causes of action that are "so related" to accompanying federal claims "that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The standard of review under Rule 12(b)(6) is well established. The court must conduct a two-part analysis to determine the sufficiency of the complaint. First, the court must separate the factual matters averred from legal conclusions asserted. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Although

10

facts pled in the complaint must be taken as true, the court may disregard any legal conclusions.  Id. at 210-11.  Second, the court must determine whether the factual matters averred are sufficient to show that plaintiff has a "plausible claim for relief."  Id. at 211 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  Ultimately, the analysis is "context-specific" and requires the court to "draw on its judicial experience and common sense" to determine whether facts alleged in the complaint suggest "more than the mere possibility of misconduct."  Ashcroft, 556 U.S. at 679.

## IV.    Discussion

Presently before the court are two motions to dismiss, filed by the Bank (Doc. 30) and by the county defendants jointly (Doc. 29).  The motions present arguments distinct to their movants, and so the court will address each motion separately.

### A.    The County Defendants

The county defendants raise a number of arguments in support of their motion to dismiss.  The court will address these arguments *seriatim*.

#### i.    *Standing*

The county defendants argue that plaintiffs Land of Believe Farm, Inc., William J. Dommel, and Robert W. Dommel lack Article III standing to bring these claims, because they have no legal interest in Farm Two and have therefore suffered no injury.  They assert that Dommel Properties, LLC is the only plaintiff that has standing.  The court rejects this argument.

A motion to dismiss for lack of standing is properly brought pursuant to Federal Rule of Civil Procedure 12(b)(1), because standing is a question of

jurisdiction. *In re* Schering Plough Corp. Intron/Temodar Consumar Class Action, 678 F.3d 235, 243 (3d Cir. 2012). The requirements of Article III standing are "familiar." Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11-12 (2004). The plaintiff must show that he or she suffered an "injury in fact," that the complained-of conduct is the cause of the plaintiff's injury, and that a favorable judgment from the court will redress that injury. Id. The plaintiff carries the burden to establish standing by the manner and degree of proof commensurate with each "successive stage[] of the litigation." American Civil Liberties Union of New Jersey v. Township of Wall, 246 F.3d 258, 261 (3d Cir. 2001). To determine whether a complaint sufficiently pleads the elements of standing to survive a motion to dismiss, the court must adopt the standard of Rule 12(b)(6), accepting as true all material allegations set forth in the complaint and construing those facts in the light most favorable to the nonmoving party. *In re* Schering Plough, 678 F.3d at 243.

Here, the Complaint makes clear that Farm Two is the locus at which the Land of Believe Farm business is located – thirty-five thoroughbred horses are boarded, bred, and foaled there by the Dommels as part of the Land of Believe Farm's operations. (Complaint, Doc. 1 at ¶ 13(b)). The Dommels have maintained a principal residence on Farm Two. Id. It is difficult to conceive of an injury in fact more concrete and more particularized than the loss of the property upon which one's home and business are located. The county defendants' motion to dismiss for lack of standing is rejected.

## ii. *The Tax Injunction Act*

The county defendants assert that the court lacks jurisdiction to hear this case under the Tax Injunction Act. For the reasons to be discussed, the court finds this argument unpersuasive.

The Tax Injunction Act, 28 U.S.C. § 1341 ("the TIA"), states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The TIA divests the district courts of jurisdiction over "suits relating to the collection of State taxes," Hibbs v. Winn, 542 U.S. 88, 104 (2004) (quoting S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937)), and is "first and foremost a vehicle to limit drastically federal court jurisdiction to interfere with so important a local concern" as taxation. Rosewell v. LaSalle Nat. Bank, 450 U.S. 503, 522 (1981).

In determining whether a claim falls within the ambit of the TIA, "it is appropriate, first, to identify the relief sought." Hibbs, 542 U.S. at 99. Though by its plain language the TIA applies only to "injunctions," the principle of comity has led courts to interpret the TIA more broadly, as a general barrier to federal court intervention in state tax collection. See, e.g., California v. Grace Brethren Church, 457 U.S. 393, 408 (1982) (interpreting the TIA to include declaratory judgments); see also Behe v. Chester Cnty. Bd. of Assessment Appeals, 952 F.2d 66, 68 (3d Cir. 1991) ("As a result of its expansive reading of the Act, the Court has woven an almost impenetrable barrier to state tax challenges in federal court.") (internal citation and

13

quotation marks omitted).  This includes damages actions brought under 42 U.S.C.

§ 1983. <u>See</u> <u>Fair Assessment in Real Estate Association, Inc. v. McNary</u>, 454 U.S.

100, 115-16 (1981); <u>id</u>. at 111 ("The focus was not on the specific form of relief

requested, but on the fact that 'in every practical sense [it] operate[d] to suspend

collection of the state taxes until the litigation [was] ended." (quoting <u>Great Lakes</u>

<u>Dredge & Dock Co. v. Huffman</u>, 319 U.S. 293, 299 (1943) (alterations in original)).

Actions for damages under § 1983 fall within the TIA's prohibition because

they necessarily interfere with the revenue collection abilities of the state.  <u>See</u>

<u>McNary</u>, 454 U.S. at 113-14 (noting that, in order for a plaintiff to recover damages

under § 1983, "in effect, the district court must first enter a declaratory judgment

like that barred in <u>Great Lakes</u>").  The TIA applies if the effect of the plaintiffs'

lawsuit is to challenge the "assessment, levy or collection" of a tax.  Plaintiffs argue

their suit does "not seek[] to 'enjoin, suspend, or restrain the assessment, levy or

collection of any tax under State law.'" (Doc. 35 at 12).  Rather, plaintiffs challenge

"the unconstitutionality of the tax sale procedures used by defendants that

deprived plaintiffs of their due process rights." (<u>Id</u>.)  Thus, as a threshold matter,

the court must decide whether the tax procedures employed by the county

defendants were deficient.

As the Supreme Court explained in <u>Hibbs</u>, the "moorings" of the TIA can be

found in state revenue protection.  542 U.S. at 106; <u>see also</u> <u>id</u>. (explaining that prior

decisions interpreting the TIA had disallowed lawsuits that "would have operated

to reduce the flow of state tax revenue").  Plaintiffs directly challenge the validity of

a tax collection procedure – a tax sale held to collect upon delinquent real estate

taxes. (See Complaint, Doc. 1 at 10 ("[O]wner Dommel Properties LLC received a

notice from the Tax Claim bureau stating that, due to delinquent real estate taxes

incurred in the Tax Year 2009 on Farm Two, a tax sale of Farm Two was scheduled

for September 12, 2011")). Despite the fact that plaintiffs seek damages rather than

an injunction, their suit would nonetheless disrupt the orderly collection of revenue

– precisely the concern that the TIA speaks to. See California v. Grace Brethren

Church, 457 U.S. 393, 410 (1982) ("If federal declaratory relief were available to test

state tax assessments, state tax administration might be thrown into disarray, and

taxpayers might escape the ordinary procedural requirements imposed by state

law."). Culled to its essence, plaintiffs' claim is a challenge to the collection of a tax,

falling squarely within the ambit of the TIA. See Potter County v. Heinrich, 408 Pa.

321, 323 (1962) (noting that the purpose of a tax sale is not to deprive the taxpayer of

property but to ensure the collection of taxes).

Because the TIA applies to plaintiffs' suit, this court lacks jurisdiction to hear

their claims against the county defendants if the available state remedies are "plain,

speedy and efficient." See § 1341. State remedies satisfy the TIA if they meet

"certain minimal procedural criteria," but need not be "the best, most convenient,

or speediest" remedies. Gass v. Cnty. of Allegheny, PA, 371 F.3d 134, 137 (3d Cir.

2004) (quoting Rosewell v. La Salle Nat'l Bank, 450 U.S. 503, 512 (1981)) (emphasis

in original). The state must provide the taxpayer with "a full hearing and judicial

determination of the controversy," id., and "a fair opportunity to challenge the

15

accuracy and legal validity of their tax obligation." Berne Corp. v. Government of The Virgin Islands, 570 F.3d 130, 137 (3d Cir. 2009) (quoting McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, 496 U.S. 18, 39 (1990)).

Pennsylvania law sets forth a scheme by which real estate tax sales may be held to satisfy delinquent tax debts. See generally 72 PA. CONS. STAT. § 5860.101 *et seq.* Pennsylvania law requires that tax claim bureaus must, within 30 days of sale, give notice to owners that the property was sold, and that the owner "may file objections or exceptions with the court relating to the regularity and procedures followed during the sale" within 30 days after the court has made a confirmation nisi of the tax claim bureau's consolidated return. § 5960.607(a.1)(1). Bureaus are also required to publish notice of tax sales in newspapers and legal journals. § 5960.607(b.1). Taxpayers may then raise objections or exceptions to the "regularity or legality of the proceedings" undertaken in the course of the sale, but may *not* challenge the validity of the taxes upon which the sale was held, the tax collector's return to the bureau, or the claim entered. § 5860.607(d). Taxpayers are "clearly and unequivocally" limited in the types of objections they can raise, to "whether the Bureau complied with the procedures delineated by the legislature to bring a delinquent tax property to a public sale and the return and confirmation thereof." Appeal of Yardley, 646 A.2d 751, 755 (Pa. Commw. Ct. 1994).

Hence, the courts of common pleas have only limited power to review tax sales. Consistent with this limited authority, the Lebanon County Court of Common Pleas held that plaintiffs' constitutional arguments were not cognizable as

objections or exceptions to the tax sale.  See *In re* Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011, No. 2011-01738, at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41-1).  The circumscribed nature of the court's review renders plaintiffs' state remedies inadequate, because a taxpayer must be able to pursue federal constitutional claims in the state proceedings.  If the taxpayer is precluded from asserting federal constitutional claims, the state proceeding cannot be regarded as "plain, speedy, or efficient."  See Strescon Industries, Inc. v. Cohen, 664 F.2d 929, 931-32 (4th Cir. 1981) (citing Township of Hillsborough v. Cromwell, 326 U.S. 620, 623 (1946)).  Here, plaintiffs attempted to raise their constitutional claims in the state court and were denied the ability to do so.  In light of deficient state court remedies, this court has subject matter jurisdiction to hear their claims.

Defendants urge the court, in the alternative, to abstain from hearing this case under Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  The court declines to do so.  "'[T]he pendency of an action in . . . state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" Marshall v. Lauriault, 372 F.3d 175, 183 (3d Cir. 2004) (quoting Colorado River, 424 U.S. at 817)); id. (abstention is appropriate only in "exceptional circumstances" and the court's analysis should be "heavily weighted in the favor of the exercise of jurisdiction") (internal citations omitted)).  Plaintiffs in this matter have been denied a state forum to air their constitutional claims; to abstain from hearing the case would put plaintiffs "effectively out of court."  Quackenbush v.

17

Allstate Ins. Co., 517 U.S. 706, 713 (1996) (internal citation and quotation marks omitted).  Abstention is therefore inappropriate in the instant matter.

iii.    *Substantive and Procedural Due Process (Count I)*

County defendants have moved to dismiss plaintiffs' claims alleging violations of their procedural and substantive due process rights.  In Count I of the Complaint, plaintiffs allege that the defendants collectively violated their due process rights by (1) orchestrating the Tax Sale with the specific intent of depriving the Dommels of their property; (2) surreptitiously buying Farm Two at the sale; (3) misleading Mr. Dommel into believing that the Bank would not bid at the sale, and failing to inform Mr. Dommel that he may lose Farm Two to the Bank; (4) misrepresenting the Bank's intent to purchase Farm Two, and failing to credit the equity in Farm Two to the Dommels' debt; and (5) failing to comply with certain elements of Pennsylvania law regarding notice of tax sales.  Plaintiffs' procedural and substantive due process claims require distinct analyses, and so will be addressed separately.

A threshold issue exists, however, as to whether plaintiffs can pursue either due process claim against the TCB under a theory of municipal liability.  In Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), the Supreme Court held that municipalities and other local government entities may be held liable under § 1983.  See Indep. Enterprises Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1173 (3d Cir. 1997).  When a plaintiff brings suit against a municipality under § 1983, "the municipality can only be liable when the alleged

18

constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted custom." <u>Mulholland v. Government Cnty. of Berks, Pa.</u>, 706 F.3d 227, 237 (3d Cir. 2013) (internal citation and quotation marks omitted). Courts have recognized two distinct theories under which <u>Monell</u> liability can lie: "policy" and "custom."

> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (internal citations omitted; alterations in original).

Here, plaintiffs have pled no facts tending to show *either* a policy or custom on the part of the TCB to engage in deprivations of the Dommels' procedural or substantive due process rights. Indeed, the only allegations of wrongdoing attributed to the TCB derive from Neuin's alleged misconduct. (<u>See, e.g.</u>, Complaint, Doc. 1 at 11 ("Mr. Dommel telephoned County Treasurer Neuin at the Tax Claim Bureau to ask how the Tax Sale went. . . . Neuin told Mr. Dommel 'We own your property. You will be looking for a new place to live.'") (emphasis omitted)). Plaintiffs make no allegation that the TCB adopted an official policy or maintained an unofficial custom of engaging in fraudulent tax sales. Plaintiffs seek to hold the TCB liable for the acts of Neuin under what amounts to nothing more than a theory of *respondeat superior* vicarious liability, which is not permitted under

§ 1983. <u>Andrews</u>, 895 F.2d at 1480. Plaintiffs' § 1983 claim against the TCB must therefore be dismissed.

The court will turn now to plaintiffs' § 1983 claim against Neuin. To survive a motion to dismiss for failure to state a claim, a plaintiff alleging deprivation of their procedural due process rights "must allege that they were deprived of an interest encompassed within the Fourteenth Amendment's protection of life, liberty, or property and that available procedures did not provide due process of law." <u>Association New Jersey Rifle and Pistol Clubs v. Governor of New Jersey</u>, — F.3d —, 2013 WL 336680, at *3 (3d Cir. January 30, 2013). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 373 (3d Cir. 1999) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976); internal quotation marks omitted). To determine whether the plaintiff has been given due process, a court must consider the factors set forth by the Supreme Court in <u>Mathews</u>:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

Plaintiffs do not facially challenge the manner in which Pennsylvania real estate tax sales are conducted; i.e., they do not allege that the statutory scheme enacted to govern tax sales is inherently constitutionally deficient. Rather, their

20

argument is that Neuin's alleged conflict of interest and deleterious intent in bringing Farm Two to sale violated their right to due process.

Plaintiffs allege that they have been wrongly deprived of their property, an injury that clearly falls within the protections guaranteed by the Fourteenth Amendment. See Chambers ex rel. Chambers v. School Dist. of Phila. Bd. of Educ., 587 F.3d 176, 194 (3d Cir. 2009). As was discussed at length *supra*, Pennsylvania law implements procedures that must be followed in order to execute a tax sale for the collection of unpaid taxes. These procedures also provide for review of tax sales, including judicial review. See, e.g., 72 PA. CONS. STAT. § 5020-511 (allowing for appeal to the Board of Revision for the revision of taxes); § 5020-518.1 (allowing for appeal to the Court of Common Pleas of a county board's tax assessment); § 5020-519 (allowing for appeal to the Superior Courts or to the Supreme Court). As previously noted, Pennsylvania law provides an opportunity to challenge confirmation of a tax sale in a state court, see § 5860.607(d), and to appeal an adverse decision, which plaintiffs have done. See Dommel Properties v. Lebanon Co. Tax Claim Bureau, No. 1621-CD-2012 (Pa. Commw. Ct. Nov. 16, 2012); cf. Berne Corp. v. Government of the Virgin Islands, 570 F.3d 130 (3d Cir. 2009) ("[D]ue process requires . . . notice and opportunity for hearing appropriate to the nature of the case."); id. ("[P]rocedural due process requires at a minimum that the taxpayer have both notice of the appeal and the right to participate."). Plaintiffs have availed themselves of Pennsylvania's "fully-developed administrative and judicial apparatus" for challenging taxes, and have not been deprived of their procedural

due process rights.  See Gass v. Cnty. of Allegheny, PA, 371 F.3d 134, 140 (3d Cir. 2004).

Turning now to plaintiffs' substantive due process claim against Neuin, we note that the core concept of substantive due process is "protection against arbitrary action" on the part of government officials, and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" United Artists Theatre Circuit, Inc. v. Township of Warrington, PA, 316 F.3d 392, 399 (3d Cir. 2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  A government employee violates the substantive component of the Due Process Clause when their "conduct amounts to an abuse of official power that 'shocks the conscience.'" Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (internal citation omitted).  "State conduct violates an individual's substantive-due-process rights when it is 'so brutal, demeaning, and harmful that it is shocking to the conscience.'" Elena v. Municipality of San Juan, 677 F.3d 1, 7-8 (1st Cir. 2012) (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 30 (1st Cir. 2008)).

What qualifies as conscience shocking is an intensely fact-specific inquiry and is likely to vary from case to case.  See Lewis, 523 U.S. at 847 ("the measure of what is conscience-shocking is no calibrated yard stick").  Generally, "it is governmental conduct intended to injure that is most likely to rise to the conscience-shocking level." Evans v. Sec'y of Pa. Dep't of Corr., 645 F.3d 650, 660 (3d Cir. 2011).  The Third Circuit has suggested that some allegations of corruption and self-dealing may suffice to state a claim for violation of a plaintiff's substantive

22

due process rights.  See Eichenlaub v. Township of Indiana, 385 F.3d 274, 285-86 (3d

Cir. 2004); see also Chainey v. Street, 523 F.3d 200, 220 (3d Cir. 2008) (allegations of

"corruption, [or] self-dealing" may suggest conscience-shocking behavior).

In the instant matter, plaintiffs' allegations against Neuin may be readily

construed as claims of corruption and self-dealing.  The Complaint asserts that

Neuin used knowledge of the Dommels' finances, gained through her role as a

member of the Bank's Board of Directors, to drive the Dommels out of business,

acquire their property and home, and expand her own assets.  The Complaint

further alleges that all of Neuin's actions were executed under color of state law in

her role as Lebanon County Treasurer and as Director of the TCB.  These

allegations are sufficient to plead a claim for violation of the Dommels' substantive

due process rights.

The county defendants' motion to dismiss Count I as to Neuin will be denied

with respect to the substantive due process argument, but granted with respect to

the procedural due process argument.  As to the TCB, Count I will be dismissed in

its entirety.

      iv.     *Inverse Condemnation (Counts II and III)*

Plaintiffs bring claims for inverse condemnation under 40 U.S.C. § 3113

(Count II) and 26 PA. CONS. STAT. § 101 *et seq.* (Count III).[5]  They allege that

_____

[5] The court notes that, in both the Complaint and in their brief, plaintiffs cite
28 PA. CONS. STAT. § 101 as the statutory provision governing their state inverse
condemnation claim.  Title 28 of the Pennsylvania statutes is reserved for the law of
escheats; title 26 contains the law of eminent domain.

defendants, "by preventing [the Dommels] . . . from generating the cash flow necessary to fulfill their financial obligations, including paying their property taxes, . . . depriv[ed] the Dommels of their property without just compensation." (Complaint, Doc. 1 at 19-20).

A claim for inverse condemnation requires a taking by the government. See Cowell v. Palmer Tp., 263 F.3d 286, 290 (3d Cir. 2001) ("Pennsylvania's Eminent Domain Code provides inverse condemnation procedures through which a landowner may seek just compensation for the taking of property." (citing 26 PA. CONS. STAT. §§ 1-408, 1-502(e), 1-609)). "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). A tax sale, however, is not a taking for a public purpose pursuant to a state's power of eminent domain, but is instead an exercise of the state's taxing power. See In re Murphy, 331 B.R. 107, 128 (S.D.N.Y. Bankr. 2005). The purpose of a tax sale is not to deprive the taxpayer of property but to ensure the collection of taxes. Potter County v. Heinrich, 408 Pa. 321, 323 (1962); see also Golden v. Mercer Cty. Tax Claim Bureau (In re Golden), 190 B.R. 52, 57 (W.D. Penn. Bankr. 1995) ("In a tax sale context, the takings clause is not dispositive nor the appropriate basis for starting an inquiry."); Industrial Bank of Washington v. Sheve, 307 F. Supp. 98, 99 (D.D.C. 1969) ("A tax sale is not a

government taking for which just compensation must be paid under the Constitution after judicial proceedings.").

Plaintiffs cite <u>Villareal v. Harris County</u>, 226 S.W.3d 537 (Tex. App. 2006), for the proposition that an irrational and egregious misuse of a state's taxing power could constitute a taking. In <u>Villareal</u>, the Texas state court held that "if the government improperly uses its taxing power to take private property for public use, then an article I, section 17 taking has occurred." <u>Id.</u> at 544. The court does not find this case persuasive. The limitations of the Texas court's holding undermines plaintiffs' argument, because the court concluded only that a use of the taxing power to take private property *for public use* could constitute a taking. Even if the Tax Sale was fraudulently conducted, it would not constitute a taking because it benefitted a private entity – specifically, by enhancing the Bank's equity position with respect to the property – and is therefore not a taking "for public use."

Plaintiffs' Complaint fails to state a claim for inverse condemnation. Therefore, the county defendants' motion to dismiss will be granted as to Counts II and III.

> v.   *The TCB's Municipal Immunity*

The Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") provides that, "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 PA. CONS. STAT. § 8541. The PSTCA expresses the legislature's "intent . . . to shield

government from liability." <u>Jones v. Southeastern Pennsylvania Transp. Auth.</u>, 772 A.2d 435, 440 (Pa. 2001).

There are instances, however, in which a local agency will not be immune under the PSTCA.  <u>See</u> § 8542.  For municipal liability to be abrogated, the allegedly tortious conduct must satisfy two preconditions and fall into one of eight exemption categories.  First, the tort must be one that would be recoverable from a defendant not having a defense of governmental immunity under § 8541, or official immunity under § 8546. § 8542(a)(1).  The injury also must have been "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties," and does not include any "acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct." § 8542(a)(2).  If a plaintiff's claim satisfies these two prerequisites, then local agencies and their employees may be liable if the claim involves vehicular liability; the agency's care, custody or control of personal property or real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; or the care, custody or control of animals. § 8542(b).

Plaintiffs do not argue that their claims fall into one of these eight enumerated exceptions.  Instead, they seek to circumvent § 8542(a)(2) under a theory of vicarious liability.  Plaintiffs argue that § 8550 strips Neuin of official immunity because their claims against her allege intentional misconduct.  Section 8550 states

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (related to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

Plaintiffs claim that Neuin's intentional misconduct can be attributed to the TCB under a theory of vicarious liability. This argument is unpersuasive. Plaintiffs cite general propositions of agency law, but fail to comprehend the differences that inhere when the principal is a government agency. Although § 8550 abrogates official immunity for intentional torts, that abrogation does not extend to municipalities such as the TCB. See Udujih v. City of Philadelphia, 513 F. Supp. 2d 350, 357-58 (E.D. Pa. 2007). Indeed, to hold otherwise would negate the *express exclusion* of "crime, actual fraud, actual malice or willful misconduct" from the torts for which municipal immunity is waived under § 8542(a)(2). Therefore, defendants' motion to dismiss Counts IV, V and VI as to the TCB will be granted.

　　　　　vi.　　*Neuin's Official Immunity*

County defendants next move to dismiss Counts IV, V, and VI as against Neuin, on the grounds that she is cloaked in official immunity for conduct performed in the course of her duties as Lebanon County Treasurer. (Doc. 32 at

17).[6]  Section 8546 grants official immunity to employees of local agencies, but an "employee is not protected by the local agency's immunity if his act constitutes a crime, actual fraud, actual malice, or willful misconduct."  Lancie v. Giles, 572 A.2d 827, 830 (Pa. Commw. Ct. 1990) (citing § 8550).  Pennsylvania courts have interpreted "willful misconduct" to mean intentional torts.  Id.  Counts IV, V, and VI allege civil conspiracy, intentional interference with contract, and conversion, respectively.  Each is an intentional tort.  See Weaver v. Franklin Cnty., 918 A.2d 194, 202 (Pa. Commw. Ct. 2007) (conspiracy); Walnut Street Assoc., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 97 (Pa. Super. Ct. 2009) (interference with contract); Snead v. Society for Prevention of Cruelty to Animals of Pennsylvania, 929 A.2d 1169, 1183 (Pa. Super. Ct. 2007) (conversion).  Therefore, Nuein is not immune from liability by virtue of her official employment, and the county defendants' motion to dismiss Counts IV, V, and VI as against Neuin, on the grounds of official immunity, will be denied.

> vii.    *Civil Conspiracy (Count IV)*

County defendants have moved to dismiss Count IV, civil conspiracy, as to both the TCB and Neuin.  To state a claim for civil conspiracy, a plaintiff must set

_____

[6] Defendants argue in their reply brief, for the first time, that Neuin is immune from liability, notwithstanding the intentional misconduct provision of § 8550, because she is a "high public official."  (Doc. 37 at 11-13).  Arguments raised for the first time in a reply brief are generally waived because fairness requires that nonmovants have the opportunity to respond to any arguments presented by the movant.  Tristate HVAC Equipment, LLP v. Big Belly Solar, Inc., 752 F. Supp. 2d 517, 529 n.8 (E.D. Pa. 2010).  Accordingly, the court deems this argument waived, and declines to consider it.  Id.

forth the following allegations: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." General Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987-988 (Pa. Super. Ct. 1997)).

In Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 184-85 (3d Cir. 2009), the Third Circuit emphasized that "allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." The Complaint "must include at least a discernible factual basis" to survive a motion to dismiss. Id. at 184; see also Feliz v. Kintock Group, 297 Fed. App'x 131, 136 (3d Cir. 2008) (recognizing that "conclusory allegations of concerted action are insufficient to satisfy the notice-pleading standard") (internal citation and quotation marks omitted); Adams v. Teamsters Local 115, 214 Fed. App'x 167, 175 (3d Cir. 2007) (noting that the complaint must "set[] forth a valid legal theory and . . . adequately state[] the conduct, time, place, and persons responsible" for the alleged conspiracy).

Plaintiffs' Complaint fails to plead a sufficient factual basis to support the existence of a conspiracy. The Complaint alleges that "Defendants knowingly and willfully conspired to maximize the assets of the Bank for the benefit of the Bank's shareholders . . . [or] of the Tax Claim Bureau, at the expense and destruction of the Dommels' businesses," (Doc. 1 at 21), but this allegation amounts to nothing more

than a conclusory assertion of misconduct.  The Complaint fails to identify any specific individuals, other than Neuin, who were parties to the alleged conspiracy, and seeks to extrapolate a conspiracy between the Bank, Neuin, and the TCB based principally upon Nuein's alleged misuse of confidential information about the Dommels' finances.  (Id. at 21-23).  Plaintiffs do not allege facts that would circumstantially suggest an agreement or conduct undertaken in furtherance of an agreed-upon endeavor.  They merely make conclusory allegations that defendants acted in concert and with improper motives, without factual support.  Plaintiffs have not plead sufficient facts to create a plausible inference of a conspiracy.  Accordingly, the county defendants' motion to dismiss will be granted as to Count IV.

> ### viii.    *Deepening Insolvency (Count XI)*

Count XI of the Complaint alleges that defendants fraudulently expanded the Dommels' corporate debt, increasing "their insolvency to a point that they could never recover."  (Complaint, Doc. 1 at 33).  Count XI names all defendants, but the allegations of fraudulent conduct relate only to the Bank.  Count XI does not levy allegations of fraud against either county defendant, nor are the county defendants named in Count VII, which alleges a separate count of fraud against the Bank.  Defendants argue that deepening insolvency is not a valid cause of action under Pennsylvania law, and that plaintiffs' claim fails as a matter of law.  (Doc. 32 at 21-22).

Plaintiffs are correct that no Pennsylvania state court has directly addressed whether a claim for deepening insolvency exists under Pennsylvania law. However, the Third Circuit has "don[ned] the soothsayer's garb" and predicted that the Pennsylvania Supreme Court would hold that deepening insolvency may give rise to a cognizable injury. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-50 (3d Cir. 2001). In the absence of an authoritative ruling from the Pennsylvania Supreme Court, the court is compelled to follow the Third Circuit's lead.[7]

Deepening insolvency occurs when "corporate property is injured through the fraudulent or concealed expansion of corporate debt and prolongation of corporate life." Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp., No. 03-3020, 2004 WL 1900001, at *3 (E.D. Pa. Aug. 25, 2004) (citing R.F. Lafferty, 267 F.3d at 347). As the county defendants correctly observe, integral to the claim of deepening insolvency is an act of fraud or the concealment of debt. Count XI simply does not allege fraud or concealment on the part of the county defendants – all allegedly fraudulent actions were undertaken by the Bank. The Complaint is devoid of any allegations of fraud on the part of the county defendants. Thus, plaintiffs have failed to state a claim for deepening insolvency against the county

---

[7] Defendants suggest that the Pennsylvania Supreme Court's decision in Official Comm. of Unsecured Creditors v. Pricewaterhousecoopers, LLP, 989 A.2d 313, 332 n.25 (2010) (hereinafter, "PWC"), casts doubt on the continued viability of the R.F. Lafferty decision. PWC, however, did not address the Third Circuit's prediction regarding the claim of deepening insolvency; hence, it does not control the court's ruling in the instant matter.

defendants, and the county defendants' motion to dismiss will be granted as to Count XI.

B.    <u>The Bank</u>

The Bank alleges numerous grounds for dismissing the Complaint. Several of their arguments substantially track those made by the county defendants, and where appropriate the court will simply refer back to its previous analysis. However, as a private actor, the Bank must be distinguished from the county defendants, and certain arguments are unique to it. The court will therefore address each argument discretely.

i.    *Ripeness*

Notwithstanding the *allegata*, the Bank argues that each of plaintiffs' claims arises out of the Tax Sale during which the Bank purchased Farm Two. It argues that because the state court proceedings determining the validity of the Tax Sale have not yet been resolved, the plaintiffs' claims against the Bank are premature. However, during the pendency of the instant motions to dismiss, the Pennsylvania Commonwealth Court discontinued plaintiffs' appeal. <u>Dommel Properties v. Lebanon Co. Tax Claim Bureau</u>, No. 1621-CD-2012 (Pa. Commw. Ct. Nov. 16, 2012) (notice of discontinuance). For the reasons discussed below, the court disagrees with the Bank's argument, and finds that plaintiffs' claims are ripe for review.

Article III limits federal court jurisdiction to "cases and controversies," and "[r]ipeness is among the requirements for a case or controversy to exist." <u>Birdman v. Office of the Governor</u>, 677 F.3d 167, 173 (3d Cir. 2012). Ripeness is "peculiarly a

question of timing." <u>Taylor Inv., Ltd. v. Upper Darby Twp.</u>, 983 F.2d 1285, 1290 (3d Cir. 1993). The ripeness analysis involves two discrete steps: first, the court must determine the fitness of the issue for judicial decision; and second, the court must weigh the relative hardships the parties would face if the court withheld consideration. <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 149 (1967), *abrogated on other grounds by* <u>Califano v. Sanders</u>, 430 U.S. 99 (1977). For a dispute to be ripe, there must exist a "concrete set of facts" upon which the court could render a decision. <u>Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio</u>, 40 F.3d 1454, 1455-56 (3d Cir. 1994).

With regard to the "fitness" prong of the ripeness analysis, the Third Circuit has identified a non-exclusive list of factors that courts should consider to determine whether a case is "fit" for judicial review. These considerations include whether the dispute is "purely legal" rather than factual, "the degree to which the challenged action is final, whether the claim involves uncertain and contingent events," whether further factual development is necessary to aid decision, and whether the parties are sufficiently adverse. <u>NE Hub Partners, L.P. v. CNG Transmission Corp.</u>, 239 F.3d 333, 342 n.8 (3d Cir. 2001). With respect to the "hardship" prong, the court should consider "whether a plaintiff faces a direct and immediate dilemma, such that lack of review will put it to costly choices." <u>Id.</u>

The gravamen of the Bank's ripeness argument is that the validity of the Tax Sale remains unsettled in the Pennsylvania court system. Plaintiffs respond that the Pennsylvania court has declined to hear their constitutional challenges to the

Tax Sale, and that the only issue addressed by the state courts is whether sufficient notice was provided to the Dommels in anticipation of the Tax Sale to comply with Pennsylvania law. On August 17, 2012, the Court of Common Pleas overruled the Dommels' objections and exceptions to the tax sale. See *In re* Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011, No. 2011-01738, slip op. at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41-1). The Commonwealth Court denied plaintiffs' application for emergency supersedeas on September 26, 2012, and the matter was discontinued on November 16, 2012. Dommel Properties v. Lebanon Co. Tax Claim Bureau, No. 1621-CD-2012 (Pa. Commw. Ct. Nov. 16, 2012).

The court concludes that plaintiffs' claims are ripe for review. First, plaintiffs claims in the instant matter differ materially from the claims they brought in state court. As previously discussed, the Lebanon County Court of Common Pleas expressly limited the scope of its review to whether the Tax Sale was conducted in compliance with statutory procedure, and it declined to consider various constitutional and state law claims presented *sub judice*. The outcome of plaintiffs' federal litigation does not depend on the outcome of the state proceedings, nor is further factual development necessary to resolve the dispute. In addition, the Complaint alleges several claims that arise out of factual circumstances separate from the Tax Sale. For example, plaintiffs have alleged that the Bank committed the tort of intentional interference with contract, by contacting the Dommels largest client and suggesting that the Dommels no longer held title to Farm Two.

34

Should the court decline to consider the claims, the hardship to plaintiffs would be significant, in light of the state court's refusal to consider plaintiffs' federal constitutional arguments, and the ancillary state law claims challenging more than the procedural propriety of the Tax Sale proceedings. Therefore, the court finds that plaintiffs' claims are ripe under Article III, and the Bank's motion to dismiss based upon ripeness will be denied.

ii.    *Civil Conspiracy (Count IV)*

Count IV of the Complaint alleges civil conspiracy to interrupt business operations against all defendants. As the court previously noted, plaintiffs have failed to plead facts sufficient to raise a plausible inference of conspiracy against the county defendants. <u>See</u> *supra* Part IV(A)(vii). Plaintiffs' conspiracy claims against the Bank suffer from the same infirmities, namely: the claims consist of little more than conclusory allegations of concerted action.

As discussed at length *supra*, "allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." <u>Capogrosso v. The Supreme Court of New Jersey</u>, 588 F.3d 180, 184-85 (3d Cir. 2009). Beyond bald conclusions, the Complaint fails to allege any facts supporting an inference of an agreement to engage in collusive activity, between the Bank and either the TCB or Neuin, or any other party for that matter. Nor does the Complaint allege facts regarding the "conduct, time, place, and persons responsible" for the alleged conspiracy. <u>Adams v. Teamsters Local 115</u>, 214 Fed. App'x 167, 175 (3d Cir. 2007). Thus, plaintiffs have failed to set forth a

plausible claim for relief based upon civil conspiracy.  The Bank's motion to dismiss will be granted as to Count IV.

>    *iii.    Substantive and Procedural Due Process (Count I)*

Plaintiffs bring their due process claims under 42 U.S.C. § 1983.  A properly plead § 1983 claim must allege "(1) a violation of a federally protected constitutional or statutory right; (2) by state action or action under color of law." <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1264 (3d Cir. 1994).  Critically – and fatal to plaintiffs' claim – section 1983 applies *only* to state action, excluding "merely private conduct, no matter how discriminatory or wrongful." <u>American Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 50 (1999) (quoting <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1003 (1982)).  State action is part of the prima facie case under § 1983, and the plaintiffs bear the burden of proof. <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 638 (3d Cir. 1995).  "[T]he defendant in a § 1983 action [must] have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>Id.</u> (quoting <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988)).

There is no dispute that the Bank is a private entity, not a state actor. Plaintiffs attempt to shoehorn the Bank into their § 1983 claim through a narrow exception for conspiratorial, collusive, or concerted action between private and state actors. <u>See</u> <u>United States v. Price</u>, 383 U.S. 787, 794 (1966).  However, as discussed *supra*, plaintiffs have failed to plead a claim of conspiracy between the Bank and the county defendants.  The *allegata* fail to establish even a "tenuous

connection" between the Bank and the alleged misconduct of the county defendants.  See Groman, 47 F.3d at 638.  The Bank's motion to dismiss will therefore be granted as to Count I.

> iv.  *Inverse Condemnation (Counts II and III)*

The Bank has moved to dismiss Counts II and III for inverse condemnation, on the grounds that, as a private actor, the Bank is incapable of committing a government taking.  See 40 U.S.C. § 3113 ("An officer of the Federal Government authorized to acquire real estate for . . . public uses may acquire the real estate for the Government by condemnation, under judicial process . . ."); see also Elena v. Municipality of San Juan, 677 F.3d 1, 7 (1st Cir. 2012) ("The Fifth Amendment . . . permits *government takings* of private property *only for public use* and with just compensation . . .") (emphasis added).  The Bank argues, in the alternative, that Counts II and III fail to state a claim upon which relief can be granted because tax sales are not takings for purposes of an inverse condemnation claim.  As discussed *supra*, the court agrees with the latter contention.  A tax sale is not a government taking pursuant to the state's power of eminent domain; rather, it is an exercise of the state's taxing power, intended to enforce tax laws and ensure the collection of revenue.  See Bank of Washington v. Sheve, 307 F. Supp. 98, 99 (D.D.C. 1969) ("A tax sale is not a government taking for which just compensation must be paid under the Constitution after judicial proceedings."). It is therefore unnecessary for the court to address the Bank's state action argument.  The Bank's motion to dismiss will be granted as to Counts II and III.

*v.*    *Tortious Interference with Contract (Count V)*

In Count V, plaintiffs allege that the Bank intentionally and tortiously interfered with the Dommels' contractual relationship with Thomas McClay ("McClay"), their largest client and a tenant of Farm Two.  They assert that the Bank's September 28, 2011 letter to McClay (the "McClay letter"), in which the Bank claimed that it was the lawful owner of Farm Two, and demanded that McClay remit all rent payments to the Bank, constituted tortious interference with contract.

Pennsylvania courts have adopted § 766 of the RESTATEMENT (SECOND) OF TORTS, which states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The Restatement articulates seven factors that a court should consider in determining whether interference is "improper" – and thus actionable.  See RESTATEMENT § 767.  In <u>Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.</u>, 20 A.3d 468 (Pa. 2011), the Pennsylvania Supreme Court formally adopted § 772 of the Restatement.  Section 772 states that intentional interference with a contract or prospective contractual relation is not improper if the interference consists of giving either truthful information, or honest advice within the scope of a request for advice.  RESTATEMENT § 772; <u>see also</u> <u>Brokerage Concepts</u>, 20 A.3d at 476-77.  The

38

Supreme Court held that § 772 specifically excludes imparting truthful information from the realm of improper interference, and that this specific exclusion trumps the general principles enunciated in § 767. Id. at 477.

The dispute between the Bank and plaintiffs is whether the McClay letter contains truthful or false information. If the Bank actually owned Farm Two after purchasing it at the Tax Sale, then the letter contains only truthful information, and plaintiffs' claim is barred as a matter of law. See id. at 478 (noting that the information imparted in an allegedly improper interference was indisputably true, and therefore if § 772 applied then the defendant would be entitled to judgment as a matter of law). The Bank argues that there is no dispute that it purchased Farm Two at the Tax Sale, thus making it the lawful owner of the property notwithstanding the fact that the Dommels were still in possession of the land. (Doc. 34 at 21) ("While Plaintiff subsequently challenged the tax sale, without a ruling from the Common Pleas Court, Jonestown Bank remains the owner of the real property."). Plaintiffs view the issue in precisely the opposite way. They argue the Bank was not the lawful owner of Farm Two at the time of the letter, because the objections and exceptions to the Tax Sale were pending before the Pennsylvania courts. The essential question, then, is: who owns the real property pending final disposition of objections to the Tax Sale?

The answer lies within Pennsylvania statutes governing tax sales. Within sixty days following a tax sale, the tax claim bureaus are required to file a consolidated return with the court of common pleas of the appropriate county

39

setting forth, *inter alia*, the name of the owner in whose name the property was assessed, the name of the owner at the time of sale and who was notified, and the name of the purchaser.  See 72 PA. CONS. STAT. § 5860.607(a).  Upon satisfactory review of the consolidated return by the court of common pleas, the return will then be confirmed nisi.  Id.  The owner then has thirty days following confirmation nisi of the consolidated return to file objections and exceptions. § 5860.607(b).  If no objections or exception to the sale are filed within thirty days after confirmation nisi, or if the court of common pleas overrules or sets aside the objections, then the prothonotary must then enter a decree of absolute confirmation. § 5860.607(d).  If, however, the objections or exceptions are sustained, the court then must enter an order invalidating the sale and ordering another sale to be held to collect the delinquent taxes. § 5860.607(e).  Once a sale is confirmed absolutely, the "sale shall be deemed to pass a good and valid title to the purchaser, free from any liens or encumbrances whatsoever, except such liens as are hereafter specifically saved, and in all respects as valid and effective as if acquired by a sheriff's deed." § 5860.607(g).  Critically, title to the land *does not pass* to the purchaser, in this case the Bank, until the sale is confirmed absolutely.  At the time that the Bank mailed the McClay letter, the sale had not been confirmed absolutely, meaning that the Bank did not have title to Farm Two.  Hence, the Bank's argument that its claim of ownership in the McClay letter was factually accurate, barring as a matter of law plaintiffs' tortious interference with contract claim, is without merit.  The Bank's motion to dismiss will be denied as to Count V.

*vi.*     *Conversion (Count VI)*

In Count VI, plaintiffs' allege conversion against all defendants. The Bank has moved to dismiss on the grounds that Pennsylvania does not recognize the tort of conversion of real property. The court agrees.

Conversion is, by definition, "an act of willful interference with *a chattel*, done without lawful justification, by which any person entitled thereto is deprived of use and possession." <u>Norriton East Realty Corp. v. Central-Penn Nat'l Bank</u>, 254 A.2d 637, 638 (Pa. 1969) (emphasis added); <u>see also</u> <u>Stevenson v. Economy Bank of Ambridge</u>, 197 A.2d 721, 726 (Pa. 1964) ("A conversion is the deprivation of another's right of property in, or use or possession of, *a chattel,* or other interference therewith, without the owner's consent and without lawful justification.") (emphasis added). And it is black letter law that a chattel is defined as "an article of personal property: any species of property *not amounting to a freehold or fee in land.*" <u>Commonwealth v. Rosicci</u>, 186 A.2d 648, 652 (Pa. Super. Ct. 1963) (quoting Black's Law Dictionary 316 (3d ed. 1933)) (emphasis added).

Plaintiffs cite <u>James v. City of Philadelphia</u>, Civ. Action No. 98-4916, 1999 WL 674371, at *3 n.2 (E.D. Pa. August 18, 1999), for the proposition that "at best, it is unclear whether Pennsylvania courts would hold real property cannot be the subject of conversion." Plaintiffs overstate the value of <u>James</u> to their argument by an extraordinary degree. The sum total of the <u>James</u> court's discussion of this issue appears in a footnote, and is reproduced here in full:

41

> Plaintiff's complaint describes count I as [*sic*] claim for conversion. Pennsylvania defines the tort of conversion as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." <u>Bernhardt v. Needleman</u>, 705 A.2d 875, 878 (Pa. Super. 1998). As a real property is not a chattel, it is unclear whether a claim of conversion can be maintained under Pennsylvania law. However, as this count cannot, in any case, be maintained, it is unnecessary to struggle with that question today.

<u>Id.</u> First, the court's single sentence, that supposedly casts doubt on the prodigious volume of contrary precedent, was pure dictum, as the court expressly stated that it was unnecessary to address that issue. <u>Id.</u> The court eschewed any review of Pennsylvania precedent because it concluded that the conversion claim "cannot, in any case, be maintained . . . ." <u>Id.</u> Plaintiffs also fail to acknowledge the introductory clause of the court's sentence, which clearly states that " a real property is not a chattel." Plaintiffs assert that "the Bank has not cited any authority which states this proposition definitively," patently ignoring the syllogism, rife in the case law, that conversion is interference with an owner's interest in chattel, and chattel definitionally excludes real property. <u>See, e.g.</u>, <u>Rosicci</u>, 186 A.2d at 652. In sum, plaintiffs have failed to state a claim for conversion, and the Bank's motion to dismiss will be granted as to Count VI.

### vii. *Breach of Fiduciary Duty (Count IX)*

The Bank has moved to dismiss Count IX of the Complaint, alleging breach of fiduciary duty, on the grounds that no such duty arose through the course of the lender-borrower relationship between the Bank and plaintiffs.

A fiduciary relationship exists when a party acts as an "advisor or counselor" to another, such that they may reasonably be expected to act with good faith in the other's best interest. <u>Silver v. Silver</u>, 219 A.3d 659, 662 (Pa. 1966). Typically, the lender-borrower relationship does not create a fiduciary duty. <u>Federal Land Bank of Baltimore v. Fetner</u>, 410 A.2d 344, 348 (Pa. Super. Ct. 1979) (citing <u>Grace et ux. v. Moll</u>, 132 A. 171, 171 (Pa. 1926)). Lenders and borrowers are presumed to have conducted their transactions at arms-length. <u>Clark Motor Co., Inc. v. Manufacturers and Traders Trust, Co.</u>, No. 4:07-CV-856, 2007 WL 2155528, at *8 (M.D. Pa. July 26, 2007) (citing <u>Temp-Way Corp. v. Continental Bank</u>, 139 B.R. 299, 318 (E.D. Pa. 1992)). However, a fiduciary duty may arise in situations where the creditor "gains substantial control over the debtor's business affairs." <u>Blue Line Coal Co., Inc. v. Equibank</u>, 683 F. Supp. 493, 496 (E.D. Pa. 1988) (quoting <u>Stainton v. Tarantino</u>, 637 F. Supp. 1051, 1066 (E.D. Pa. 1986)). To establish a fiduciary relationship, plaintiffs must show that the Bank exercised control over the "day-to-day management and operations" of plaintiffs' business, or that the Bank "had the ability to compel . . . [plaintiffs] to engage in unusual transactions." <u>Temp-Way</u>, 139 B.R. at 318. "[T]he mere monitoring of the borrower's operations and the proffering of management advice by lenders without more is not enough to create a fiduciary duty." <u>Clark Motor Co.</u>, 2007 WL 2155528, at *8.

Plaintiffs assert that the power disparity between the Bank and plaintiffs, coupled with the Bank's recommendation that plaintiffs press forth with their construction loan despite being over-extended, gave rise to a fiduciary duty. (<u>See,</u>

e.g., Complaint, Doc. 1 at ¶ 12 ("the Dommels relied upon the Bank's superior expertise, knowledge and advice in connection with the Dommels loans and business dealings with the Bank"); ¶ 23 (plaintiffs did not seek the advice of counsel before executing promissory notes); ¶ 26 (the Bank advised plaintiffs to continue construction on Farm Two); ¶ 27 (Mr. Dommel believed that the Bank would act in the Dommels' best interests)). These allegations, plaintiffs suggest, demonstrate that the Bank had become so ensconced in the financial affairs of plaintiffs horse-breeding business that a duty arose to act in plaintiffs' best interests. The court disagrees.

The critical element necessary to establish a fiduciary duty between a lender and a borrower is the lender's control over the borrower's business. None of plaintiffs' allegations come close to establishing that the Bank exercised the kind of control over the Dommels' business necessary to trigger that type of relationship. The only allegation that edges in the right direction is that the Bank advised the Dommels to continue with construction on Farm Two, and that is plainly insufficient to demonstrate that the Bank exercised day-to-day control over management decisions. See Temp-Way, 139 B.R. at 318. Similarly, the Bank's purported assertions that it would continue to act "in good faith" with the Dommels in attempting to settle their debt did not create a fiduciary duty, because a lender's mere attempt to minimize risk does not establish the lender's "control" over the borrower. James E. McFadden, Inc. v. Baltimore Contractors, Inc., 609 F. Supp. 1102, 1105 (E.D. Pa. 1985).

44

Plaintiffs fail to plead facts sufficient to support their claim for breach of fiduciary duty, and so the Bank's motion to dismiss will be granted as to Count IX.

### viii.    *Deepening Insolvency (Count XI)*

The only ground that the Bank asserts for dismissing plaintiffs' claim for deepening insolvency is that this tort is not recognized in Pennsylvania. The Bank does not challenge the claim on its merits. As discussed *supra*, however, the court is bound by the Third Circuit's holding in <u>Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267 F.3d 340, 349 (3d Cir. 2001), predicting that Pennsylvania courts would in fact recognize such a tort. Therefore, the Bank's motion to dismiss Count XI will be denied.

### ix.    *Supplemental Jurisdiction*

The Bank argues that if the federal claims are dismissed, the court should decline to exercise supplemental jurisdiction over the remaining state law claims. District courts have supplemental jurisdiction over state law claims that are "so related" to federal claims "that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). District courts, however, "may" decline supplemental jurisdiction if all claims over which it had original jurisdiction are dismissed. <u>See</u> 28 U.S.C. § 1367(c)(3). However, § 1367(c)(3) is not implicated here because a district court's supplemental jurisdiction extends even over "claims asserted by or against additional parties," so long as the claims "form part of the same case or controversy" over which the court has original jurisdiction. <u>HB General Corp. v. Manchester Partners, L.P.</u>, 95 F.3d 1185, 1197-98 (3d Cir. 1996). As

45

noted previously, the court will dismiss the federal claims against the Bank, but a federal claim remains against Neuin. The remaining claims against the Bank share a "common nucleus of operative fact," <u>see</u> <u>City of Chicago v. Intern'l College of Surgeons</u>, 522 U.S. 156, 164-65 (1997), with the remaining constitutional claim against Neuin, such that it is appropriate for the court to exercise jurisdiction over the remaining claims against the Bank. Therefore, the Bank's motion to dismiss for want of supplemental jurisdiction will be denied.

**V.**     <u>**Conclusion**</u>

For the reasons previously discussed, the defendants' motions to dismiss will be granted in part and denied in part. An appropriate order will issue.


                                 <u>S/ Christopher C. Conner</u>
                                  CHRISTOPHER C. CONNER
                                  United States District Judge


Dated:        March 19, 2013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOMMEL PROPERTIES, LLC,** | : | **Civil Action No. 1:11-cv-2316** |
| **LAND OF BELIEVE FARM, INC.,** | : | |
| **WILLIAM J. DOMMEL, and** | : | **(Judge Conner)** |
| **ROBERT W. DOMMEL,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JONESTOWN BANK AND TRUST** | : | |
| **COMPANY,** *now known as* **JBT,** | : | |
| **LEBANON COUNTY TAX CLAIM** | : | |
| **BUREAU, and SALLIE A. NEUIN** | : | |

## ORDER

AND NOW, this 19th day of March, 2013, upon consideration of the motions

to dismiss of defendants Lebanon County Tax Claim Bureau and Sallie A. Neuin

(Doc. 29), and defendant Jonestown Bank and Trust Company (Doc. 30), and for the

reasons discussed in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motions to dismiss are GRANTED in part and DENIED in part.

2. Counts I, II, III, IV, V, VI and XI are dismissed in their entirety as to the Lebanon County Tax Claim Bureau.

3. Counts II, III, IV, and XI are dismissed in their entirety as to Sallie A. Neuin. Count I is dismissed as to Neuin with respect to plaintiffs' procedural due process claim.

4. Counts I, II, III, IV, VI, and IX are dismissed in their entirety as to Jonestown Bank and Trust Company.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge