## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOMMEL PROPERTIES, LLC,** | : | **CIVIL ACTION NO. 1:11-CV-02316** |
| **LAND OF BELIEVE FARM, INC.,** | : | |
| **WILLIAM J. DOMMEL, and** | : | **(Chief Judge Conner)** |
| **ROBERT W. DOMMEL,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JONESTOWN BANK AND TRUST** | : | |
| **COMPANY,** *now known as* **JBT,** | : | |
| **LEBANON COUNTY TAX CLAIM** | : | |
| **BUREAU, and SALLIE A. NEUIN,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

Presently before the court in the above-captioned matter are three cross-motions for summary judgment filed by (1) plaintiffs William J. Dommel, Robert W. Dommel, Land of Believe Farm, Inc., and Dommel Properties, LLC (collectively, the "Dommels") (Doc. 96), (2) defendant Jonestown Bank and Trust Company (the "Bank") (Doc. 91), and (3) defendant Sallie A. Neuin ("Neuin") (Doc. 90). For the reasons that follow, the court will grant the Bank and Neuin's motions for summary judgment and deny the Dommels' motion for summary judgment.

## I. Factual Background and Procedural History

### A. Parties

Plaintiff William J. Dommel ("Mr. Dommel") is an individual currently residing in Annville, Pennsylvania. (Doc. 97 ¶ 3; Doc. 106 ¶ 3; Doc. 109 ¶ 3). His

father, Robert W. Dommel, is deceased.[1]  (Doc. 97 ¶ 4; Doc. 106 ¶ 4; Doc. 109 ¶ 4).  At

all relevant times, the Dommels owned the two plaintiff entities, to wit: Land of

Believe Farm, Inc., a Pennsylvania corporation, and Dommel Properties, Inc., a

Pennsylvania limited liability company.  (Doc. 97 ¶¶ 5-6; Doc. 106 ¶¶ 5-6; Doc. 109

¶¶ 5-6; see also Doc. 92 ¶ 3; Doc. 113 ¶ 3).

Defendant Jonestown Bank and Trust Company is a Pennsylvania state

banking corporation with its place of business in Cleona, Pennsylvania.  (Doc. 97

¶ 1; Doc. 106 ¶ 1; Doc. 109 ¶ 1).  For purposes of the instant action, the Bank's

primary representative is Richard Rollman, the Vice President of Commercial

Lending, who reports directly to Roger Jeremiah, the Senior Vice President of

Lending.  (Doc. 97 ¶¶ 30, 34; Doc. 106 ¶¶ 30, 34; Doc. 109 ¶ 30).

Defendant Sallie A. Neuin is the Lebanon County Treasurer, the Director of

the Lebanon County Tax Claim Bureau (the "TCB"), and a Director on the Bank's

Board of Directors.  (Doc. 97 ¶ 2; Doc. 106 ¶ 2; Doc. 109 ¶ 2).  Neuin was elected to

office as Lebanon County Treasurer in January 2004 and is currently serving her

third four-year term.  (Doc. 97 ¶¶ 78-79; Doc. 109 ¶¶ 78-79; see also Doc. 94 ¶ 1; Doc.

---

[1] Under Federal Rule of Civil Procedure 25(a)(1), if a party dies and the claim
is not extinguished, the court may order substitution of the proper party, or a
motion for substitution may be made by any party or by the decedent's successor or
representative.  Fed. R. Civ. P. 25(a)(1).  If a motion for substitution is not made
within 90 days after service of a notice of death, the court must dismiss the action
by or against the decedent.  Id.  As the Bank correctly notes, the Estate of Robert
Dommel did not move to substitute itself as a party within 90 days of the notice of
death filed on April 10, 2013.  (See Doc. 72; Doc. 93 at 60-61).  Accordingly, the court
will dismiss plaintiff Robert W. Dommel as a plaintiff in the above-captioned
matter.

111 ¶ 1).  In June 2008, Neuin was also appointed Director of the TCB, a separate

municipal agency, and continues to serve in that capacity.  (Doc. 97 ¶¶ 80-81; Doc.

109 ¶¶ 80-81; see also Doc. 94 ¶ 3; Doc. 111 ¶ 3).  As Director, Neuin supervises the

TCB, which handles collection of taxes, notices of tax delinquency, tax sales, and

other duties under Pennsylvania's Real Estate Tax Sale Law, 72 PA. CONS. STAT.

§ 5860.101 et seq.  (Doc. 94 ¶ 4; Doc. 111 ¶ 4).  On March 10, 2009, upon nomination

from her husband, Howard Neuin, Neuin became a Director on the Bank's Board of

Directors. (Doc. 97 ¶¶ 82-83; Doc. 109 ¶¶ 82-83; see also Doc. 94 ¶ 6; Doc. 111 ¶ 6).

Together, the Neuins own approximately 4.2% of the Bank's shares and are among

its largest shareholders.  (Doc. 97 ¶ 84; Doc. 106 ¶ 84; Doc. 109 ¶ 84).

### B.    Loan Transactions

Mr. Dommel and his late father, Robert Dommel, engaged in the commercial

horse-breeding business for more than twenty-five years.  (Doc. 97 ¶ 7; Doc. 106 ¶ 7;

Doc. 109 ¶ 7).  At one time, the Dommels owned three properties: (1) "Farm One"

located at 83 Sherk's Church Road, Palmyra, Pennsylvania, consisting of 96 acres,

(2) "Farm Two" located at 7 Coon Creek Road, Palmyra, Pennsylvania, consisting of

68 acres, and (3) a hunting camp located in Lycoming County, Pennsylvania,

consisting of 500 acres.  (Doc. 97 ¶ 11; Doc. 106 ¶ 11; Doc. 109 ¶ 11).

On March 26, 2006, the Dommels executed a Demand Promissory Note

("First Note") for a $1.3 million line of credit with the Bank, as approved by the

Board of Directors.[2]  (Doc. 97 ¶¶ 13-14; Doc. 106 ¶¶ 13-14; <u>see also</u> Doc. 92 ¶¶ 19, 21;

Doc. 113 ¶¶ 19, 21).[3]  Prior to the construction of Farm Two, the Dommels attempted

to sell Farm One, but were unable to consummate a private sale.  (Doc. 97 ¶¶ 17-18;

Doc. 106 ¶¶ 17-18).  As a result, Mr. Dommel requested a meeting with the Bank's

representatives in October 2006 and expressed a concern about sufficient funds to

continue construction on Farm Two.  (Doc. 97 ¶ 19; Doc. 106 ¶ 19; <u>see also</u> Doc. 92

¶¶ 24-27, 33; Doc. 113 ¶¶ 24-27, 33).  The Dommels allege that the Bank's

representatives encouraged them to move forward with Farm Two.  (Doc. 97 ¶ 20;

<u>see also</u> Doc. 92 ¶ 34; Doc. 113 ¶ 34).  The Bank denies making any assurances and

states that the Dommels merely requested an additional loan to complete the

construction.  (Doc. 106 ¶¶ 19-20).  The Bank's representatives agreed to raise the

loan request with the Board.  (Doc. 106 ¶ 19; <u>see also</u> Doc. 92 ¶¶ 36-38; Doc. 113

¶¶ 36-38).

On January 23, 2007, the Dommels accepted a construction loan ("Second

Note") for $2,425,000 from the Bank.  (Doc. 97 ¶ 22; Doc. 106 ¶ 22; <u>see also</u> Doc. 92

---

[2] In addition to the promissory note, the Dommels executed a guaranty and mortgage documents.  (Doc. 92 ¶ 21; Doc. 113 ¶ 21).  Relevant to the instant action, the loan documents granted the Bank the right to confess judgment and to foreclose on Farms One and Two for non-payment or other events of default.  (Doc. 92 ¶ 22; Doc. 113 ¶ 22).

[3] Neuin denies the Dommels' statement of facts relating to the Bank's conduct prior to March 2009 because Neuin was not elected to the Board until March 10, 2009 and was not involved with the loans transacted prior to that time.  (<u>See, e.g.</u>, Doc. 109 ¶¶ 9-10, 13-19, 21-22, 24-28, 31-60, 63-70; <u>see also</u> Doc. 79 ¶ 82; Doc. 109 ¶ 82).

¶¶ 39-41; Doc. 113 ¶¶ 39-41).  At that time, the Dommels believed that they could

repay the Second Note through the sale and boarding of horses.  (Doc. 92 ¶¶ 42-43;

Doc. 113 ¶¶ 42-43).  Finally, on May 31, 2007, the Dommels signed a third note with

the Bank for $605,000 ("Third Note") and pledged the hunting camp as security for

the loan.  (Doc. 97 ¶ 24; Doc. 106 ¶ 24; <u>see also</u> Doc. 92 ¶¶ 44-46; Doc. 113 ¶¶ 44-46).

### C.      Relationship with the Bank

Former Bank President Howard Neuin introduced Mr. Rollman to William

Dommel in December 2005 and initiated the Bank's relationship with the Dommels.

(Doc. 97 ¶ 31; Doc. 106 ¶ 31; <u>see also</u> Doc. 92 ¶ 15; Doc. 113 ¶ 15).  As the manager of

that relationship, Mr. Rollman was involved in closing the First, Second, and Third

Notes.  (Doc. 97 ¶¶ 32-33; Doc. 106 ¶¶ 32-33).  Mr. Rollman also consulted Mr.

Jeremiah about the Dommels and relied upon Mr. Jeremiah's expertise.  (Doc. 97

¶ 34; Doc. 106 ¶ 34).  As a member of the senior management committee, Mr.

Jeremiah attends all board meetings at the Bank.  (Doc. 97 ¶ 35; Doc. 106 ¶ 35).  He

is also a member of the asset liability management committee.  (Doc. 97 ¶ 35; Doc.

106 ¶ 35).

By August 2007, the Bank became aware that the Dommels were struggling

to maintain sufficient cash flow and held regular meetings with the Dommels

regarding their loans.  (Doc. 97 ¶¶ 38-39; Doc. 106 ¶¶ 38-39; <u>see also</u> Doc. 92 ¶¶ 47, 49-

53, 58; Doc. 113 ¶¶ 47, 49-53, 58).  Ultimately, the Dommels were unable to make

their scheduled payments, and the Board voted to declare the Dommels in default

of their loan obligations on March 11, 2008.[4]  (Doc. 97 ¶¶ 42-43; Doc. 106 ¶¶ 42-43; <u>see</u> <u>also</u> Doc. 92 ¶ 64; Doc. 113 ¶ 64).  Thereafter, the Bank continued to meet with the Dommels to negotiate a debt workout and to resolve the outstanding debt.  (Doc. 97 ¶ 45; Doc. 106 ¶ 45).

On May 2, 2008, the Dommels attended a meeting with Mr. Rollman, Mr. Jeremiah, and the Bank's counsel.  (Doc. 97 ¶ 47; Doc. 106 ¶ 47).  After the meeting, Mr. Rollman recommended to the Board that the Dommels sign a forbearance agreement.  (Doc. 106 ¶ 47). (Doc. 97 ¶¶ 50-51; Doc. 106 ¶¶ 50-51; <u>see</u> <u>also</u> Doc. 92 ¶ 70; Doc. 113 ¶ 70).  In the forbearance agreement, the Dommels acknowledged their outstanding loans, the related events of default, and the Bank's ability to exercise its rights and remedies under the loan documents.  (Doc. 92 ¶¶ 70-71; Doc. 113 ¶¶ 70-71; <u>see</u> <u>also</u> Doc. 97 ¶ 50; Doc. 106 ¶ 50).  The Dommels further agreed to sell Farm One at an auction with a reserve sale price of $2.2 million.[5]  (Doc. 97 ¶ 59; Doc. 106 ¶ 59; <u>see</u> <u>also</u> Doc. 92 ¶ 71; Doc. 113 ¶ 71).

---

[4] The Dommels allege that the Board was required to approve *any* decision with respect to the Dommels' loans.  (Doc. 97 ¶¶ 36-37).  In response, the Bank asserts that Board approval is required only with respect to new loans and problematic credit issues.  (Doc. 106 ¶¶ 36-37).

[5] In rather perplexing fashion, the Dommels initially suggest that the Bank forced the auction of Farm One, but later admit that they approached the Bank to request an auction.  (<u>Compare</u> Doc. 97 ¶ 53; Doc. 106 ¶ 53 <u>and</u> Doc. 92 ¶ 72; Doc. 113 ¶ 72).  In fact, the Dommels chose the auctioneer with the Bank's approval, and the Bank agreed to pay the auction costs.  (Doc. 92 ¶ 72; Doc. 113 ¶ 72).

### D.  Disposition of Farm One

On August 21, 2008, a public auction was held for Farm One, and the Bank's representatives, including Mr. Rollman and Mr. Jeremiah, were present.  (Doc. 97 ¶ 56; Doc. 106 ¶ 56).  During the auction, an announcement was made that any offer was contingent upon the Board's approval,[6] and Farm One eventually received a single bid of $1,815,000.  (Doc. 97 ¶¶ 58, 60; Doc. 106 ¶¶ 58, 60; see also Doc. 92 ¶ 73; Doc. 113 ¶ 73).  The Bank rejected the offer on August 28, 2008 after receiving a letter from the Dommels' counsel.  (Doc. 97 ¶ 61; Doc. 106 ¶ 61; see also Doc. 92 ¶¶ 76-77; Doc. 113 ¶¶ 76-77).  Counsel's letter expressed concerns about the low bid given the high market value of the property and threatened litigation if the Bank accepted the bid price.  (Doc. 106 ¶ 61; see also Doc. 92 ¶ 77; Doc. 92-3, Ex. X; Doc. 113 ¶ 77).  After the failed auction, Mr. Rollman and Mr. Jeremiah continued to meet with Mr. Dommel regarding the status of the loans.  (Doc. 97 ¶ 63; Doc. 106 ¶ 63).

On October 10, 2008, the Bank confessed judgment on the First, Second, and

---

[6] The parties dispute who made the announcement.  The Dommels appear to blame the Bank for interfering with the auction.  (Doc. 97 ¶¶ 57-58, 61-62).  The Bank responds that the parties agreed to an announcement substituting approval for the reserve sale price in order to encourage bidding.  (Doc. 106 ¶ 58).

Third Notes.[7]  (Doc. 97 ¶ 65; Doc. 106 ¶ 65; see also Doc. 92 ¶¶ 65, 78; Doc. 113 ¶¶ 65,

78).  Despite the confessed judgments, Mr. Rollman and Mr. Jeremiah continued to

communicate with the Dommels to reach a debt workout agreement.  (Doc. 97

¶¶ 67-69; Doc. 106 ¶¶ 67-69).  The Bank reiterates, however, that its representatives

never informed the Dommels that the Bank would not pursue its rights and

remedies under the loan documents.  (Doc. 106 ¶¶ 67-69).  Ultimately, the Bank and

the Dommels were unable to reach an agreement, and the Bank proceeded to

execute upon the judgments.  (Doc. 97 ¶ 70; Doc. 106 ¶ 70).

On July 23, 2009, the Bank conducted a Sheriff's Sale of Farm One as part of

execution of the judgments.  (Doc. 97 ¶ 75; Doc. 106 ¶ 75).  The Bank tendered the

sole bid of $1.5 million and ultimately purchased Farm One for costs in the amount

of $11,053.31.  (Doc. 97 ¶ 75; Doc. 106 ¶ 75; see also Doc. 92 ¶ 79; Doc. 113 ¶ 79).  The

Bank then filed a Petition to Fix Fair Market Value and, following a hearing

thereon, the Lebanon County Court of Common Pleas set the fair market value of

Farm One at $1.5 million.  (Doc. 92 ¶¶ 80; Doc. 92-3, Ex. BB; Doc. 113 ¶ 80).

On August 10, 2009, the Bank entered into a second forbearance agreement

with the Dommels on Farm Two for a one-year term, in which the Dommels once

_____

[7] On November 21, 2008, the Dommels filed Petitions to Strike and/or Open
Confessed Judgment, in which they raised only the issue of excessive attorney's
fees.  (Doc. 92 ¶¶ 66-67; Doc. 92-3, Ex. T; Doc. 113 ¶¶ 66-67).  The Dommels did not
challenge the loan documents, the alleged events of default, or the amount of the
judgments.  (Doc. 92 ¶ 68; Doc. 113 ¶ 68).  The Lebanon County Court of Common
Pleas eventually deemed the petitions withdrawn by stipulation.  (Doc. 92 ¶ 69; Doc.
92-3, Ex. U; Doc. 113 ¶ 69).

again acknowledged the loan defaults and the Bank's rights and remedies under the loan documents. (Doc. 92 ¶¶ 86-88; Doc. 113 ¶¶ 86-88). The Dommels also agreed to pay the Bank $10,000 per month as well as market the hunting camp for sale. (Doc. 92 ¶ 88; Doc. 113 ¶ 88). The hunting camp eventually sold for $575,000 in March 2010.[8] (Doc. 97 ¶ 12; Doc. 106 ¶ 12; Doc. 109 ¶ 12; see also Doc. 92 ¶ 89; Doc. 113 ¶ 89). The parties dispute whether the Dommels' received appropriate credits for the fair market value of Farm One and the proceeds of the sale of the hunting camp. (Doc. 92 ¶¶ 81, 90; Doc. 113 ¶¶ 81, 90).

###     E.    Tax Sale of Farm Two

As of January 2011, the Bank continued to work towards a viable resolution of the Dommels' remaining debt. (Doc. 97 ¶¶ 76-77; Doc. 106 ¶¶ 76-77). Upon the expiration of the second forbearance agreement, the Bank listed Farm Two for a Sheriff's Sale in October 2011. (Doc. 92 ¶ 94; Doc. 113 ¶ 94). In addition to their outstanding loan obligations, the Dommels failed to pay property taxes on Farm Two, and the Dommels owed $63,805.76 for tax years 2008 to 2010. (Doc. 94 ¶ 18; Doc. 111 ¶ 18; Doc. 92 ¶ 96; Doc. 113 ¶ 96). On September 13, 2010, the Dommels entered into a tax payment plan with the TCB, but they were unable to make scheduled payments. (Doc. 94 ¶ 19; Doc. 111 ¶ 19; Doc. 92 ¶¶ 97-98; Doc. 113 ¶¶ 97-98). As a result, the TCB provided the Dommels with notice of public sale on July 7,

---

[8] On March 26, 2010, the Dommels signed an Acknowledgment of Sales Agreement, wherein the Dommels agreed to the adequacy of the purchase price and the application of the sale proceeds to the outstanding loans. (Doc. 92 ¶ 93; Doc. 113 ¶ 93).

2011. (Doc. 109 ¶ 88; <u>see also</u> Doc. 94 ¶ 20; Doc. 111 ¶ 20; Doc. 92 ¶ 99; Doc. 113 ¶ 99).

Pursuant to Pennsylvania's Real Estate Tax Sale Law, the TCB was required to

conduct an upset tax sale[9] of Farm Two in the second year of tax delinquency.

(Doc. 109 ¶ 88; Doc. 94 ¶ 21); <u>see also</u> 72 PA. CONS. STAT. § 5860.601.

When Neuin became a Director of the Bank on March 10, 2009, she began

attending the Bank's board meetings, in which the Board received updates on the

Dommels' loans. (Doc. 97 ¶¶ 82, 86-87; Doc. 106 ¶¶ 86-87; Doc. 109 ¶¶ 82, 86-87).

Neuin acknowledges that, in that capacity, she voted on matters involving the

Dommels; she abstained, however, from any decisions related to the tax sale of

Farm Two. (Doc. 109 ¶ 87; <u>see also</u> Doc. 94 ¶ 34). In fact, when the Bank decided to

bid on Farm Two, the meeting minutes indicate that Neuin abstained from the

Board's vote. (Doc. 109 ¶¶ 95-96; <u>see also</u> Doc. 97 ¶¶ 95-96; Doc. 94 ¶ 33; Doc. 111

¶ 33).

Prior to the upset tax sale, Neuin discussed the tax liens on Farm Two with

the Bank and faxed related information from the TCB to the Bank on August 31,

2011. (Doc. 97 ¶¶ 89-90; Doc. 106 ¶¶ 89-90; Doc. 109 ¶¶ 89-90). Neuin asserts that the

information available to her as Director of the TCB was a matter of public record

and that such information was often provided to mortgage holders for delinquent

--------

[9] The objective of an upset tax sale is to recover all delinquent taxes against a property to all taxing districts. A property sold at an upset tax sale is subject to a minimum upset price that includes delinquent real estate taxes, corporation tax claims of the Commonwealth of Pennsylvania, and municipal claims and costs of notice and sale. <u>See</u> 72 PA. CONS. STAT. § 5860.601.

properties.  (Doc. 109 ¶¶ 89-90; <u>see also</u> Doc. 94 ¶ 5).  Moreover, any information

Neuin received as a Director of the Bank had no effect on the execution of the tax

sale of Farm Two.  (Doc. 109 ¶¶ 91-94; <u>see also</u> Doc. 97 ¶¶ 91-94).

During the summer of 2011, the Bank continued to meet with the Dommels

about resolving their outstanding debt.  (Doc. 97 ¶ 97; Doc. 106 ¶ 97).  On September

9, 2011, Mr. Dommel met with Mr. Jeremiah and gave the Bank a check for $5,000.

(Doc. 97 ¶ 98; Doc. 106 ¶ 98; <u>see also</u> Doc. 92 ¶ 101; Doc. 113 ¶ 101).  According to the

Dommels, Mr. Rollman believed the payment was part of a workout scenario to

resolve the Dommels' debt.  (Doc. 97 ¶ 99; <u>see also</u> Doc. 92 ¶ 102; Doc. 113 ¶ 102).

The Bank counters that the parties had discussed $5,000 a month as a possible

workout scenario several months prior to the payment.  (Doc. 106 ¶ 99).  However,

at the time of payment, Mr. Jeremiah gave Mr. Dommel a letter that stated that the

payment was not part of any agreement and expressly reserved its rights and

remedies under the loan documents.  (<u>Id.</u> ¶¶ 98-99; <u>see also</u> Doc. 92 ¶¶ 104-05).  Mr.

Dommel denies receiving the letter[10] and did not sign any other documents in

connection with his payment.  (Doc. 97 ¶ 102; Doc. 106 ¶ 102; <u>see also</u> Doc. 113

¶ 104).

Mr. Dommel called Mr. Rollman later that day and inquired about the

remaining liens on Farm Two.  (Doc. 97 ¶ 103; Doc. 106 ¶ 103; <u>see also</u> Doc. 92 ¶ 106;

Doc. 113 ¶ 106).  In discussing the tax sale, Mr. Rollman stated that he did not know

---

[10] Nonetheless, the Dommels admit that their counsel received a copy of the
letter via e-mail correspondence on September 9, 2011.  (Doc. 113 ¶ 105).

how the Bank would purchase the property at the tax sale.[11]  (Doc. 97 ¶ 103; Doc.

106 ¶¶ 103-04).  Based upon this conversation, the Dommels did not attend the upset

tax sale that evening.  (Doc. 97 ¶ 109; Doc. 106 ¶ 109; see also Doc. 94 ¶ 27; Doc. 111

¶ 27).  Mr. Rollman, Mr. Jeremiah, and the Bank's counsel attended the tax sale on

behalf of the Bank, and Neuin was also present.  (Doc. 97 ¶¶ 110, 112; Doc. 106

¶¶ 110, 112; Doc. 109 ¶¶ 110, 112; see also Doc. 94 ¶¶ 24, 26; Doc. 111 ¶¶ 24, 26).  The

Bank entered the sole bid and purchased Farm Two for $110,401.95.[12]  (Doc. 97

¶¶ 111, 115; Doc. 106 ¶¶ 111, 115; Doc. 109 ¶¶ 111, 115; see also Doc. 94 ¶¶ 22, 28-29;

Doc. 111 ¶¶ 22, 28-29; Doc. 92 ¶ 110; Doc. 113 ¶ 110).

Mr. Dommel called Neuin the next morning, and Neuin informed Mr.

Dommel that he needed to look for a new place to live.  (Doc. 97 ¶ 116; Doc. 106

¶ 116; Doc. 109 ¶ 116).  According to Mr. Dommel, Mr. Jeremiah informed him that

---

[11] Mr. Rollman also testified that, prior to the upset tax sale, the Dommels'
remaining options were filing bankruptcy, paying the taxes, or conveying the
property to the Bank in a deed in lieu of foreclosure.  (Doc. 97 ¶ 106; Doc. 106 ¶ 106).
The Dommels allege that the Bank did not want to alert the Dommels to the Bank's
intentions and allow the Dommels to protect their interests in the property before
the tax sale.  (Doc. 97 ¶¶ 104-05).  The parties dispute, however, whether the
Dommels had the wherewithal to remove the tax liens on Farm Two.  (Doc. 97 ¶ 107;
Doc. 106 ¶ 107; Doc. 109 ¶ 107; see also Doc. 94 ¶ 27; Doc. 111 ¶ 27; Doc. 92 ¶ 107;
Doc. 113 ¶ 107).  Nevertheless, there was no legal impediment to the Dommels'
initiation of bankruptcy proceedings.

[12] On October 14, 2011, the Dommels filed objections and exceptions to the
tax sale of Farm Two in the Lebanon County Court of Common Pleas, arguing, *inter
alia*, that the tax sale is void for improper notice, violations of due process,
conspiracy, and fraud.  (Doc. 94 ¶ 30; Doc. 111 ¶ 30; Doc. 92 ¶ 111; Doc. 113 ¶ 111).
The Lebanon County Court of Common Pleas overruled the Dommels' objections
and exceptions on August 17, 2012.  (Doc. 94 ¶ 31; Doc. 111 ¶ 31; Doc. 92 ¶ 112; Doc.
113 ¶ 112).

the Board made the decision to buy Farm Two over the weekend, but the record is devoid of any evidence that a board meeting took place on the weekend immediately before the tax sale.  (Doc. 97 ¶¶ 117-19).  Defendants assert that the Board's decision occurred on August 30, 2011, nearly two weeks prior to the sale.[13] (Doc. 106 ¶¶ 117-19; Doc. 109 ¶¶ 117-19; see also Doc. 94 ¶ 32; Doc. 111 ¶ 32).  After the tax sale, Neuin continued to participate in board meetings at the Bank regarding the disposition of the Dommels' property.  (Doc. 97 ¶¶ 121-22; Doc. 106 ¶¶ 121-22; Doc. 109 ¶¶ 121-22).  However, the minutes of the Board meetings reflect only that the Directors received information that the Bank had purchased Farm Two.  (Doc. 97 ¶ 122; Doc. 106 ¶ 122; Doc. 109 ¶ 122).

On September 28, 2011, Mr. Rollman contacted Dommel's largest client, Tom McClay, by letter on behalf of the Bank and represented that the Bank was the current owner of Farm Two.[14]  (Doc. 97 ¶¶ 124-26; Doc. 106 ¶¶ 124-26; Doc. 109 ¶¶ 124-26; see also Doc. 94 ¶ 35; Doc. 111 ¶ 35).  According to the Bank, Mr. Rollman believed that the Bank acquired ownership at the upset tax sale upon paying the taxes and securing insurance even prior to the deed transfer.  (Doc. 106 ¶ 126).  The primary dispute between the parties centers on the effect of the letter upon Mr.

---

[13] The Bank did not produce meeting minutes from the August 30, 2011 board meeting in which the Board voted to purchase Farm Two at the tax sale because the discussion took place between the Bank and its counsel, thereby invoking the attorney-client privilege.  (Doc. 106 ¶¶ 118-19).

[14] The parties agree that Neuin did not directly contact Mr. McClay.  (Doc. 94 ¶ 38; Doc. 111 ¶ 38).  The Dommels further admit that they are unaware of any other contact with their existing or prospective clients.  (Doc. 113 ¶ 119).

McClay.  The Dommels contend that Mr. Rollman's correspondence caused Mr. McClay to reduce the number of horses that he boarded at Farm Two because he was concerned that the Bank would intercede and prevent him from moving his horses.  (Doc. 97 ¶¶ 129-30; <u>see</u> <u>also</u> Doc. 111 ¶¶ 36-37; Doc. 113 ¶¶ 120-21). Defendants refute this contention and assert that Mr. McClay has boarded a consistent number of horses on Farm Two.  (Doc. 106 ¶ 130; <u>see</u> <u>also</u> Doc. 94 ¶¶ 36-37; Doc. 92 ¶¶ 120-22).

On January 26, 2012, the Dommels tendered payment to the TCB in the full amount of the upset sale price for Farm Two.  (Doc. 97 ¶ 108; Doc. 106 ¶ 108; Doc. 109 ¶ 108).  The Dommels aver that, after initially accepting the payment, the TCB attempted to impose conditions on its acceptance.  (Doc. 97 ¶ 108).  Neuin denies that the TCB accepted the payment in satisfaction of the Dommels' tax debt and contends that conditions were discussed only in the context of failed settlement negotiations.  (Doc. 109 ¶ 108).

Lastly, the Dommels claim that the Bank failed to produce monthly statements reflecting their numerous loans payments and that the Bank cannot explain how certain credits were applied.  (Doc. 97 ¶¶ 131-35; <u>see</u> <u>also</u> Doc. 113 ¶¶ 153, 159-62).  The Bank categorically denies this contention.  According to the Bank, the Dommels received monthly statements, showing the account number, account balance, and current payments due, as well as documents identifying relevant credits.  (Doc. 106 ¶¶ 131-35; <u>see</u> <u>also</u> Doc. 92 ¶¶ 153, 159-62; Doc. 106-1, Ex. C).  These credits included $1.5 million for the fair market value of Farm One

retroactive to the date of the Sheriff's Sale, the purchase price for the hunting

camp, and $1,388,207 for the fair market value of Farm Two.  (Doc. 106 ¶ 135; see

also Doc. 92 ¶¶ 159-62).  As of December 2013, the Bank states that the Dommels'

outstanding loan obligations to the Bank amount to $2,181,388.43.  (Doc. 92 ¶ 163).

      **F.**    **Procedural History**

On December 14, 2011, the Dommels filed a Complaint (Doc. 1) against the

Bank, Neuin, and the Lebanon County Tax Claim Bureau, alleging a total of eleven

claims for the decline of their businesses and loss of their properties.  Pursuant to

the court's order (Doc. 64) dated March 19, 2013, the court dismissed all claims

against the TCB and several of the claims against the Bank and Neuin.  The

remaining claims against the Bank are governed by state law: intentional

interference with contract (Count V), fraud (Count VII), negligence (Count VIII),

promissory estoppel (Count X), and deepening insolvency (Count XI).  The

remaining claims against Neuin are: violation of substantive due process rights

pursuant to 42 U.S.C. § 1983 (Count I), intentional interference with contract (Count

V), and conversion (Count VI).[15]  On December 3, 2013, the parties filed cross-

motions for summary judgment on all of the remaining claims.  (Docs. 90, 91, 96).

The motions are fully briefed and ripe for disposition.

**II.**    <u>**Legal Standard**</u>

---

[15]  The Dommels do not oppose Neuin's motion for summary judgment (Doc.
90) with respect to the claim for conversion.  (Doc. 110 at 1 n.1, 6).  Accordingly, the
court will grant Neuin's motion as to Count VI of the Complaint.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A factual dispute is material if it might affect the outcome of the action under applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson, 477 U.S. at 250-57; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently. InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); see also Irvin v. United Mine

16

Workers of Am. Health & Ret. Funds, No. 05-1072, 2007 WL 539646, at *1 (W.D. Pa. Feb. 15, 2007); 10A CHARLES ALAN WRIGHT ET AT., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990); see also Strategic Learning, Inc. v. Wentz, No. 05-467, 2006 WL 3437531, at *4 (M.D. Pa. Nov. 29, 2006).

## III.   Discussion

The instant cross-motions for summary judgment present several distinct issues. First, the court must determine whether, as a state official, Neuin violated the substantive protections of the Due Process Clause of the Fourteenth Amendment. Second, the court must consider whether any of the parties are entitled to summary judgment on the intentional interference with contractual relations claim. Third, the court must assess whether the doctrines of res judicata and collateral estoppel bar the remaining claims against the Bank. Fourth, the court must evaluate the Dommels' fraud and negligence claims under the "gist of the action" and economic loss doctrines prior to considering the merits of the claims. Finally, the court must decide whether summary judgment is appropriate for the promissory estoppel and deepening insolvency claims. The court will address each issue *seriatim*.

### A.   Count I - Section 1983 Claim for Violation of Substantive Due Process

17

Section 1983 of Title 42 of the United States Code provides a cause of action to redress violations of federal law committed by state officials.  See 42 U.S.C. § 1983.  Section 1983 is not a source of substantive rights, but merely a method for vindicating those rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim under section 1983, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  The parties do not dispute that, at all times relevant to the tax sale of Farm Two, Neuin was acting under color of state law.  (Doc. 98 at 6; Doc. 110 at 9).

The Dommels allege that Neuin violated the substantive protections of the Due Process Clause of the Fourteenth Amendment.  (Doc. 1 ¶¶ 82-90).  To establish a substantive due process claim, the Dommels must prove (1) that the particular interest at issue is protected by the due process clause, and (2) that the government's deprivation of that protected interest "shocks the conscience."  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008); United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400-02 (3d Cir. 2003).  It is well-established that "ownership is a property interest worthy of substantive due process protection."  DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 600 (3d Cir. 1995), abrogated on other grounds by United Artists, 316 F.3d at 392.  Thus, evidence that Neuin deprived the Dommels of their property interest in Farm Two by conducting

18

the tax sale clearly satisfies the first element of a substantive due process claim.

Turning to the second element, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  The Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (internal quotation marks and citation omitted).  Official conduct is sufficiently egregious when it "shocks the conscience," see id. at 846-47, and conduct that rises to the level of conscience-shocking "varies depending on the context." United Artists, 316 F.3d at 399 n. 5; Lewis, 523 U.S. at 847 ("[T]he measure of what is conscience shocking is no calibrated yard stick.").

"[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Lewis, 523 U.S. at 849; Evans v. Sec'y of Pa. Dep't of Corr., 645 F.3d 650, 660 (3d Cir. 2011).  Thus, a state official may shock the conscience when his or her conduct amounts to an abuse of official power.  Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994).  In particular, the Third Circuit has recognized that evidence of corruption and self-dealing by a state official may establish a substantive due process claim.  See Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285-86 (3d Cir. 2004); see also Chainey, 523 F.3d at 220 (allegations of "corruption, [or] self-dealing" may suggest conscience-shocking behavior).  However, official conduct that may be "unfair" or "improper" from a property owner's perspective

does not constitute a substantive due process violation.  <u>Maple Props., Inc. v. Twp.</u> <u>of Upper Providence</u>, 151 F. App'x 174, 180 (3d Cir. 2005).

The court finds that summary judgment is appropriate in this case because the Dommels fail to show that Neuin engaged in conscience-shocking behavior by conducting the tax sale of Farm Two.  Conduct that does not "transgress the 'outer limit' of legitimate governmental action . . . do[es] not give rise to a federal substantive due process claim."  <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 505 (2d Cir. 2001); <u>see</u> <u>also</u> <u>Lewis</u>, 523 U.S. at 849.  Here, the Dommels do not provide any evidence that, as Director of the TCB, Neuin improperly conducted the upset tax sale under Pennsylvania's Real Estate Tax Sale Law.  Nor is there a genuine dispute of material fact that the tax sale of Farm Two was related to a legitimate government interest, namely the power to levy or enforce local property taxes.  <u>See</u> <u>Highway Materials, Inc. v. Whitemarsh Twp.</u>, 386 F. App'x 251, 258 (3d Cir. 2010) (affirming summary judgment where government conduct preventing the development of property was related to a legitimate concern of increased traffic). Without evidence of an arbitrary exercise of official power, the Dommels simply cannot maintain a substantive due process claim.

The Dommels nonetheless argue that Neuin's conduct with respect to Farm Two shocks the conscience because Neuin engaged in self-dealing.  The Dommels allege that she disregarded an obvious conflict of interest between her positions as a

Director of the Bank and as Director of the TCB.[16]  (Doc. 98 at 10; Doc. 110 at 11-18).

In these conflicting capacities, Neuin conveyed information about the Dommels'

property from the TCB to the Bank, and participated and voted in the Bank's board

meetings regarding the Dommels' property.  (Doc. 98 at 8-9; Doc. 110 at 11-18).

Contrary to the Dommels' assertion, relevant case law does not uniformly

treat conflicts of interest as actionable self-dealing.  "Self-dealing" is defined as

"[p]articipation in a transaction that benefits oneself instead of another who is owed

a fiduciary duty."  Honey Brook Estates v. Honey Brook Twp., No. 09-6190, 2012 WL

2076985, at *14 (E.D. Pa. June 7, 2012) (citing BLACK'S LAW DICTIONARY (9th ed.

2009)).  In the context of substantive due process, the Third Circuit requires

---

[16] The Dommels also argue that Neuin is liable for alleged misrepresentations by Bank representatives to the Dommels about the Bank's disinclination to pursue Farm Two at the tax sale.  This argument is unavailing.  A Section 1983 claim requires both state action and personal involvement.  To satisfy the state action requirement, the defendant must have used authority derived from the state in causing the alleged harm.  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005); Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998); Mikhail v. Kahn, No. 13-5130, __ F. Supp. 2d __, 2014 WL 114340, at *26 (E.D. Pa. Jan. 13, 2014) ("Only where the State is responsible for the specific conduct causing the alleged harm does § 1983 apply.").  "[A]cts of officers in the ambit of their personal pursuits are plainly excluded."  Washington-Pope v. City of Phila., No. 12-4300, __ F. Supp. 2d__, 2013 WL 5728577, at *7 (E.D. Pa. Oct. 22, 2013).  Section 1983 claims also require personal involvement of a defendant.  Donahue v. Hearthway, No. 3:13-CV-1280, 2013 WL 3945934, at *4 (M.D. Pa. July 30, 2013).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  The record is devoid of evidence that Neuin personally made any representations to the Dommels about the tax sale of Farm Two, or that Neuin personally directed Mr. Rollman and Mr. Jeremiah to make any representations attributable to the TCB.  Therefore, the court rejects this argument.

egregious acts of self-dealing to satisfy the conscious-shocking standard.  See, e.g.,
United Artists, 316 F.3d at 402 (collecting cases); Highway Materials, 386 F. App'x at
257 (noting that "a bad-faith violation of state law . . . does not meet the [conscience-
shocking] standard"); Hankin Family P'ship v. Upper Merion Twp., No. 01-1622,
2012 WL 43610, at *21 (E.D. Pa. Jan. 6, 2012) (finding evidence of self-dealing where
Board of Supervisors' zoning decision based on several members' aim to depress
value of plaintiffs' property and then rezone property to raise value in order to
assist other developers in acquiring property and eliminating competition).
Allegations or evidence that merely demonstrate improper motive are insufficient.
See Chainey, 523 F.3d at 220; see, e.g., Locust Valley Golf Club, Inc. v. Upper
Saucon Twp., 391 F. App'x 195, 199 (3d Cir. 2010) (stating that evidence of a board
member's previously attempt to purchase the property at issue showed only
improper motive, not self-dealing).

Viewed in a light most favorable to the Dommels, the factual record does not
rise to the level of conscience-shocking.  In contrast to most land use disputes,
Neuin did not exercise discretionary power; the Real Estate Tax Sale Law
mandates a tax sale upon two years of tax delinquency.  (Doc. 109 ¶ 88; Doc. 94 ¶ 21);
see also 72 PA. CONS. STAT. § 5860.601.  It is undisputed that the TCB complied with
all the requisite procedures under the Real Estate Tax Sale Law.  (Doc. 92-4, Ex.
NN at 13).  Moreover, the Dommels fail to controvert defendants' assertions that
Neuin merely provided the Bank with public information and that Neuin abstained
from voting on the acquisition of Farm Two.  (See Doc. 111 ¶¶ 5, 33).  Finally, there

is no evidence beyond conclusory allegations that Neuin retained any personal benefit from conducting the tax sale of Farm Two.  (See Doc. 110 at 12, 18; Doc. 117 at 3 ("[A]s a Board Member and shareholder of the Bank, she had a vested interest in the tax sale."); see also Honey Brook Estates, 2012 WL 2076985, at *15.  In essence, this aspect of the Dommels' claim attempts to link the beneficial consequences of the statutorily imposed tax sale to the Bank's shareholders.  (Doc. 110 at 12, 18; Doc. 117 at 3-4).  The court concludes that this evidence is simply too attenuated and does not satisfy the Dommels' strict burden of proof with respect to self-dealing.  Therefore, the court will grant Neuin's motion and deny the Dommels' motion for summary judgment as to Count I of the Complaint.

### B.    Count V - Intentional Interference With Contractual Relations

In Count V of the Complaint, the Dommels allege that the Bank and Neuin intentionally interfered with the Dommels' contractual relationship with their largest client, Thomas McClay, who boarded his horses on Farm Two.  (Doc. 1 ¶¶ 117-26).  After the tax sale and prior to the deed transfer for Farm Two, Mr. Rollman sent a letter dated September 28, 2011 to Mr. McClay, in which the Bank claimed to be the current owner of Farm Two and requested that Mr. McClay remit all lease payments directly to the Bank.  (Doc. 97 ¶¶ 124-26; Doc. 106 ¶¶ 124-26; Doc. 109 ¶¶ 124-26).

In Pennsylvania, Section 766 of the Restatement (Second) of Torts governs the tort of intentional interference with existing contractual relations.  See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 470-71 (Pa. 1979).  Section 766

provides that:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979); see also Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 98 (Pa. Super. Ct. 2009).  The elements of an intentional interference with contractual relations claim are: (1) the existence of a contractual relationship between the plaintiff and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.  CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d Cir. 2004); Bakare v. Pinnacle Health Hosps., Inc., 469 F. Supp. 2d 272, 294 (M.D. Pa. 2006); Phillips v. Selig, 959 A.2d 420, 429 (Pa. Super. Ct. 2008).  As a preliminary matter, the parties do not dispute that the Dommels maintained a contractual relationship with Mr. McClay; thus, the first element of the intentional interference claim is satisfied.

### 1.   *Defendant Neuin*

Neuin moves for summary judgment on grounds that she took no part in sending the letter to Mr. McClay or any other communication with existing or prospective clients. (Doc. 95 at 20, 22-23). In response, the Dommels claim that Neuin is liable for the Bank's actions as a Director and as one of the Bank's largest shareholders. (Doc. 110 at 24). It is hornbook law that "corporate officers cannot be held liable for the alleged torts committed by the corporation simply by virtue of their offices." <u>Ueberroth v. Goldner, Papandon, Childs & DeLuccia, LLC</u>, No. 11-3119, 2012 WL 834737, at *2 (E.D. Pa. Mar. 12, 2012) (citation omitted); <u>Chester-Cambridge Bank & Trust Co. v. Rhodes</u>, 31 A.2d 128, 131 (Pa. 1943). In order to find a corporate officer or shareholder personally liable for the conduct of the corporation, the plaintiff must show that piercing the corporate veil is appropriate, or that the officer or shareholder actively participated in the alleged tortious conduct. <u>Ueberroth</u>, 2012 WL 834737, at *2; <u>see</u> <u>also</u> <u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 89-90 (Pa. 1983).

The participation theory creates liability for corporate officers and directors for malfeasance, not simple nonfeasance. <u>Wicks</u>, 470 A.2d at 90; <u>see</u> <u>also</u> <u>Al–Khazraji v. St. Francis College</u>, 784 F.2d 505, 518 (3d Cir. 1986) (holding that a corporate officer who takes part in the commission of a tort by the corporation or whose corporation commits a tort under his or her direction or control may be personally liable for such tort); <u>Donsco, Inc. v. Casper Corp.</u>, 587 F.2d 602, 606 (3d Cir. 1978); <u>Zubik v. Zubik</u>, 384 F.2d 267, 275 (3d Cir. 1967). "[T]he mere averment

that a corporate officer should have known the consequences of the liability-creating corporate act is . . . insufficient to impose liability." <u>Wicks</u>, 470 A.2d at 90. Nor is it sufficient that a corporate officer was charged with the general supervision of a corporation's affairs. <u>McCracken v. Daimler Chrysler Motors Co. LLC</u>, No. 07-2202, 2008 WL 920344, at *3 (E.D. Pa. Apr. 3, 2008).

The Dommels assert that, as a Director on the Bank's Board, Neuin was involved in all of the Bank's decisions involving the Dommels. (Doc. 110 at 25; Doc. 117 at 8-9). The evidence of record does not support this assertion. The Board's role was limited to authorizing certain discrete actions to manage the problem credit relationship with the Dommels, such as negotiating forbearance agreements, confessing and executing judgments, and bidding at the tax sale. (<u>See</u> Doc. 117 at 9). The only evidence of Board action after the tax sale are board meeting minutes from September 13, 2011 and October 11, 2011. (<u>See</u> Doc. 110 at 25-26). These minutes indicate that Mr. Jeremiah first informed the Board, including Neuin, that the Bank had acquired Farm Two at the upset tax sale and later that the eviction process had started. (Doc. 110 at 25-26; Doc. 111-11, Ex. J, at 3).

Drawing all reasonable inferences in the Dommels' favor, no reasonable jury would find that the Board or Neuin personally participated in or directed Mr. Rollman to send the McClay letter or to engage in any communications with the Dommels' clients upon acquisition of Farm Two. At most, the Board generally supervised its credit relationship with the Dommels. Therefore, the court will grant Neuin's motion and deny the Dommels' motion for summary judgment as to Count

V of the Complaint.

### 2.  *Defendant Bank*

The Dommels seek to hold the Bank liable for intentional interference with contractual relations based on Mr. Rollman's actions as an agent of the Bank. See Tayar v. Camelback Ski Corp., Inc., 47 A.3d 1190, 1196 (Pa. 2012); Travelers Cas. & Sur. Co. v. Castegnaro, 772 A.2d 456, 460 (Pa. 2001) (stating that a principal is liable for the torts of its agents, as long as those acts occurred within the scope of agent's employment); Petrina v. Allied Glove Corp., 46 A.3d 795, 799 (Pa. Super. Ct. 2012) ("Where a representative for a corporation acts within the scope of his or her employment or agency, the representative and the corporation are one and the same entity, and the acts performed are binding on the corporate principal."); Maier v. Maretti, 671 A.2d 701, 707 (Pa. Super. Ct. 1995).

The Bank opposes the intentional interference claim on grounds that Dommels cannot adduce evidence of breach or non-performance in the contractual relationship.  (Doc. 93 at 29-20; Doc. 107 at 6-8).  To satisfy the second element of an intentional interference claim, the plaintiff must establish that the defendant intended to harm the plaintiff and caused a breach or non-performance in the existing contractual relationship.  Dreiling Millennium Trust II v. Reliant Renal Care, Inc., 833 F. Supp. 2d 429, 433-34 (E.D. Pa. 2011) (finding that "the bulk of the case law, as well as the plain language of the Restatement (Second) of Torts section 766 [which Pennsylvania has adopted], mandates that a plaintiff bringing an intentional interference claim must allege breach or nonperformance").

27

In the Complaint, the Dommels allege that the Bank "intended to harass, interfere, and did interfere, with Mr. Dommel's contractual relationship" by contacting Mr. McClay.  (Doc. 1 ¶¶ 119, 121).  The court finds no evidence that the letter from the Bank to Mr. McClay resulted in a breach or non-performance of the boarding contract.  The Dommels vaguely aver that, at some point over the years, Mr. McClay has boarded as many as 40 horses, but that Mr. McClay eventually reduced the number of horses to 10 horses after receiving the Bank's letter.  (Doc. 98 at 13-14; Doc. 114 at 13-14; Doc. 118 at 3-4).  Without adequate record support, these conclusory averments are insufficient to establish non-performance.  There is no evidence in the record that the contract between the Dommels and Mr. McClay required Mr. McClay to board a certain number of horses with the Dommels. Indeed, the billing invoices from the Dommels to Mr. McClay demonstrate that the number of boarded horses fluctuated from month to month.  (See Doc. 106-1, Ex. D).  When Mr. McClay received the letter from the Bank in October 2011, he was boarding 27 horses on Farm Two.  (See Doc. 118 at 4).  After boarding between 19 and 29 horses from October 2011 through February 2012, Mr. McClay decreased the number of horses to 10 horses in May 2012, seven months after the Bank's letter. (See Doc. 121 at 12).  As of December 2013, Mr. McClay again boarded 20 horses with the Dommels.  (See Doc. 98 at 14; Doc. 118 at 3).  Based on this evidence of record, the Dommels fail to establish that Mr. McClay in fact breached or failed to perform any obligations under the existing contract due to the Bank's letter. Accordingly, the court will grant summary judgment as to Count V of the Complaint

28

in favor of the Bank and against the Dommels.

### C.  Doctrines of Res Judicata and Collateral Estoppel

The Bank moves for summary judgment on the remaining claims pursuant to the doctrines of res judicata and collateral estoppel.  (Doc. 93 at 23-28).  According to the Bank, the Lebanon County Court of Common Pleas previously considered and decided the Dommels' claims related to the Bank's alleged misrepresentations concerning the tax sale of Farm Two.  (Id. at 23).

As an initial matter, the court notes that the Bank failed to assert the affirmative defenses of res judicata and collateral estoppel in its answer to the Complaint.  (See Doc. 66); see also FED. R. CIV. P. 8(c); Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found., 402 U.S. 313, 350 (1971) ("Res judicata and collateral estoppel are affirmative defenses that must be pleaded.").  Generally, failure to raise an affirmative defense in a responsive pleading or by appropriate motion results in waiver.  See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991); Chainey, 523 F.3d at 210 n.5 ("The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and an opportunity to demonstrate why the affirmative defense should not succeed.") (citation omitted); Goddard v. State Farm Mut. Auto. Ins. Co., CIV.A. 11-6309, __ F. Supp, 2d __, 2014 WL 199840, at *5 (E.D. Pa. Jan. 16, 2014).  However, a "defendant does not waive an affirmative defense if '[h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'"  Charpentier, 937 F.2d at 863-64 (citation

omitted); see also Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 506 (3d Cir. 2006)

(stating that "affirmative defenses can be raised by motion, at any time (even after

trial), if plaintiffs suffer no prejudice").

Here, the Dommels do not allege prejudice from the Bank's failure to plead

the res judicata and collateral estoppel affirmative defenses and the Dommels had

the opportunity to fully address both defenses in responding to the Bank's motion

for summary judgment.  See, e.g., Brown v. Deparlos, 492 F. App'x 211, 216 (3d Cir.

2012) (finding no prejudice from affirmative defense at summary judgment phase

when plaintiff had the opportunity to confront the defense in responding to the

motion for summary judgment).  Accordingly, the court will consider whether the

doctrines of res judicata and collateral estoppel bar the remaining claims against

the Bank.

### 1.   *Res Judicata*

"Res judicata, or claim preclusion, prohibits parties involved in prior,

concluded litigation from subsequently asserting claims in a later action that were

raised, or could have been raised, in the previous litigation." Wilkes *ex rel.* Mason

v. Phoenix Home Life Mut. Ins. Co., 902 A.2d 366, 376 (Pa. 2006) (citing R/S Fin.

Corp. v. Kovalchick, 716 A.2d 1228, 1230 (Pa. 1998)); Matternas v. Stehman, 642 A.2d

1120, 1123 (Pa. Super. Ct. 1994) ("Where there has previously been rendered a final

judgment on the merits by a court of competent jurisdiction, the doctrine of res

judicata will bar any future suit on the same cause of action between the same

parties.").  Under Pennsylvania law,[17] the following elements must be present for

res judicata to apply: "(1) identity of the thing sued upon; (2) identity of the cause of

action; (3) identity of the parties; (4) identity of the capacity of the parties."

Robinson Coal Co. v. Goodall, 72 A.3d 685, 689 (Pa. Super. Ct. 2013) (citation

omitted); Matternas, 642 A.2d at 1123.  "The essential inquiry [in a res judicata

analysis] is whether the ultimate and controlling issues have been decided in a prior

proceeding in which the present parties had an opportunity to appear and assert

their rights."  Chada v. Chada, 756 A.2d 39, 43 (Pa. 2000) (quoting Hammel v.

Hammel, 636 A.2d 214, 218 (Pa. Super. Ct. 1994)).

    The court will deny the res judicata defense on the basis of lack of identity of

the thing sued upon and in the cause of action.  The proceeding in the Lebanon

County Court of Common Pleas was an action *in rem*,[18] whereas the current action

is *in personam*.  In other words, the initial proceeding "merely address[ed] the

---

[17] Federal courts are required to give state court judgments "the same full
faith and credit . . . as they have by law or usage in the courts of such State . . . from
which they are taken."  See 28 U.S.C. § 1738.  A district court must therefore "treat
a state court judgment with the same respect that it would receive in the courts of
the rendering state."  Matushita Elec. Indus. Co. Ltd. v. Epstein, 516 U.S. 367, 373
(1996); see also Lance v. Dennis, 546 U.S. 459, 466 (2006) ("Congress has directed
federal courts to look principally to *state* law in deciding what effect to give state-
court judgments.") (emphasis in original).  Accordingly, the court will look to
Pennsylvania state law regarding the applicability of res judicata.  See Brown v.
Tucci, 960 F. Supp. 2d 544, 566-67 (W.D. Pa. 2013); Smith v. Holtz, 30 F. Supp. 2d
468, 476 (M.D. Pa. 1998).

[18] As the Dommels correctly note, the collection of delinquent property taxes
is an *in rem* proceeding pursuant to Pennsylvania's Real Estate Tax Sale Law.
Swanson v. Forest Cnty. Tax Claim Bureau, 5 Pa. D. & C. 3d 11, 14 (Pa. Ct. Com. Pl.
1977).

rights of parties vis-a-vis a parcel of property.  It [did] not address the rights of

parties vis-a-vis each other."  Matternas, 642 A.2d at 1123.  The court in Matternas

explained that "[i]t sometimes happens that out of the same transaction there arise

rights both in personam and in rem.  In such case, a judgment in rem does not

merge the action in personam on the original claim, and does not constitute a bar to

an action thereon."  Id. at 1125; see also Robinson Coal Co., 72 A.3d at 689 (holding

that latter replevin action not barred by res judicata where "prior cause of action

related to breach of contract rather than replevin, and the ownership of the coal

was not litigated in that lawsuit"); Ruparcich v. Borgman, 547 A.2d 1279, 1281 (Pa.

Commw. Ct. 1988) (finding no identity of cause of action between actions for

damage to personal property and action for personal injuries and lost wages).

Furthermore, the Lebanon County Court of Common Pleas explicitly limited

the state court proceeding to the issue of the TCB's compliance with statutory

procedures pertaining to a tax sale of delinquent properties.  (Doc. 92-4, Ex. NN at

13-15).  The court explained that all other claims against Neuin or the Bank, such as

fraud, were not relevant to the validity of the upset tax sale, but that such personal

liability claims may be appropriate in other proceedings.  (Id.)  For these reasons,

the court rejects the Bank's res judicata defense.

### 2.   *Collateral Estoppel*

Unlike the doctrine of res judicata, collateral estoppel or issue preclusion

does not require identity of cause of action or parties.  Thompson v. Karastan Rug

Mills, 323 A.2d 341, 344-45 (Pa. 1974); Matternas, 642 A.2d at 1125.  Collateral

estoppel will bar only those issues that were conclusively determined in a prior adjudication and essential to the original judgment. <u>Witkowski v. Welch</u>, 173 F.3d 192, 198-99 (3d Cir. 1999); <u>Matternas</u>, 642 A.2d at 1125. By foreclosing subsequent disputes over issues on which a court has ruled, collateral estoppel "reduces the costs of multiple lawsuits, facilitates judicial consistency, conserves resources, and encourages reliance on adjudication." <u>Witkowski</u>, 173 F.3d at 199 (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)) (internal quotation marks omitted).

Under Pennsylvania law,[19] collateral estoppel is appropriate when:

(1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

<u>Office of Disciplinary Counsel v. Kiesewetter</u>, 889 A.2d 47, 50-51 (Pa. 2005); <u>see</u> <u>also</u> <u>Irish v. Ferguson</u>, 970 F. Supp. 2d 317, 355 (M.D. Pa. 2013); <u>Prusky v. Reliastar Life Ins. Co.</u>, 502 F. Supp. 2d 422, 430 (E.D. Pa. 2007), <u>aff'd</u>, 532 F.3d 252 (3d Cir. 2008). The party seeking to invoke collateral estoppel bears the burden to prove each of the elements. <u>Dici v. Pennsylvania</u>, 91 F.3d 542, 548 (3d Cir. 1996).

In the instant action, the Lebanon County Court of Common Pleas held that the only cognizable claim regarding objections or exceptions to a tax sale is whether

---

[19] <u>See</u> <i>supra</i> note 17; <u>see</u> <u>also</u> <u>Irish v. Ferguson</u>, 970 F. Supp. 2d 317, 355 (M.D. Pa. 2013) (applying Pennsylvania state law regarding the doctrine of collateral estoppel); <u>Butler v. Hartlaub</u>, 1:08-CV-02240, 2012 WL 174962, at *3 (M.D. Pa. Jan. 20, 2012) (same).

the TCB complied with statutorily required procedures for a tax sale.  (Doc. 92-4,

Ex. NN at 13-15).  Other claims, such as fraud or deprivation of due process, did not

fall within the ambit of cognizable objections or exceptions to the tax sale.  (Id.)

Nevertheless, the Lebanon County Court of Common Pleas proceeded to address

the Dommels' objections based on Neuin's alleged conflict of interest, contact with

clients, and fraud.  Therefore, the court must determine whether the findings on

the additional claims were essential to the prior judgment under the fifth element of

collateral estoppel.  The requirement that a preclusive finding must have been

essential to a judgment is rooted in principles of fairness.  Jean Alexander

Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 250 (3d Cir. 2006).  "[P]arties

should be estopped only on issues they actually deem important, and not on

incidental matters."  Lynne Carol Fashions, Inc. v. Cranston Print Works Co., 453

F.2d 1177, 1183 (3d Cir. 1972).  This requirement also ensures that preclusive effect

is not given to issues that did not receive close judicial attention, or that were

unappealable by virtue of being incidental to a decision.  See Jean Alexander

Cosmetics, Inc., 458 F.3d at 250; Restatement (Second) of Judgments § 27 cmt. h

(1980).

   The pertinent inquiry for the court is whether the parties as well as the trier

of fact recognized the issue as necessary to the first judgment.  See Restatement

(Second) of Judgments § 27 cmt. j.  Here, the Lebanon County Court of Common

Pleas explicitly recognized that its jurisdiction under the Real Estate Tax Sale Law

was limited to procedural challenges to the tax sale.  (Doc. 92-4, Ex. NN at 13-15).

The court concludes that the Lebanon County Court of Common Pleas' opinions with respect to the other claims against Neuin and the Bank were mere dicta and not essential to the prior judgment.  Hence, collateral estoppel is not appropriate in this case.

### D.    "Gist of the Action" Doctrine

In Count VII of the Complaint, the Dommels assert a fraud claim against the Bank, alleging that the Bank falsely represented its intentions toward Farm Two at the tax sale to induce the Dommels not to protect their property interests.  (Doc. 1 ¶¶ 136-43).  The Dommels also allege in Count VIII that the Bank negligently breached a duty to comply with standard banking protocols and procedures in connection with the loan transactions and thereby caused the Dommels to lose their property.  (Id. ¶¶ 145-47).  The Bank moves for summary judgment on grounds that the "gist of the action" and economic loss doctrines bar the fraud and negligence claims.  (Doc. 93 at 31-43).

The "gist of the action" doctrine[20] precludes a party from raising tort claims

---

[20] The Pennsylvania Supreme Court has not explicitly adopted the "gist of the action" doctrine, but both the Third Circuit and the Pennsylvania Superior Court have predicted that it would do so.  See Williams v. Hilton Grp. PLC, 93 F. App'x 384, 385-86 (3d Cir. 2004); eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002); see also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996) ("When a state's highest court has not spoken on a subject, we must attempt to predict how that tribunal would rule.  In making such determinations, we give due deference to the decisions of lower Pennsylvania courts. The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent a persuasive indication that the highest state court would rule otherwise.") (citations omitted).

where the essence of the claim actually lies in a contract that governs the parties' relationship.  See Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 718 (Pa. Super. Ct. 2005) (citing eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Ct. 2002)).  The purpose of the "gist of the action" doctrine is to maintain the conceptual distinction between breach of contract claims and tort claims.  See Bash v. Bell Tel. Co. of Pa., 601 A.2d 825, 829 (Pa. Super. Ct. 1992).  "Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law.  Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals."  Id.  The applicability of the "gist of the action" doctrine is a question of law for the court to decide.  Reginella Constr. Co. v. Travelers Casualty & Surety Co. of Am., 949 F. Supp. 2d 599, 614 (W.D. Pa. 2013).

For the performance or non-performance of a contract to constitute an actionable tort, it "must be the gist of the action, the contract being collateral." eToll, 811 A.2d at 14 (quoting Bash, 601 A.2d at 829).  The "gist of the action" doctrine bars a tort claim where (1) the claim arises from a contract between the parties; (2) the duties breached were created by the contract; (3) liability derives from the contract; or (4) the success of the tort claim is wholly dependent upon the contract's terms.  Id. at 19.  In other words, the court must inquire as to the source of the duties allegedly breached.  "[I]f the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral

36

to the contract, the claim sounds in tort." The Knit With v. Knitting Fever, Inc.,

Nos. 08-4221 & 08-4775, 2009 WL 3427054, at *5 (E.D. Pa. Oct. 20, 2009).

"[T]he 'gist of the action doctrine' cannot be captured by any precisely

worded test.  Instead, the doctrine appears to call for a fact-intensive judgment as to

the true nature of a claim." Williams v. Hilton Grp. PLC, 93 F. App'x 384, 386 (3d

Cir. 2004).  Moreover, "[t]he test is not limited to discrete incidents of conduct;

rather, the test is, by its own terms, concerned with the nature of the action as a

whole." Am. Guarantee & Liab. Ins. Co. v. Fojanini, 90 F. Supp. 2d 615, 622 (E.D.

Pa. 2000).

### 1.    *Count VII - Fraud*

The Dommels aver that the Bank misrepresented its intentions to purchase

Farm Two at the tax sale and induced the Dommels to not protect their property

interest.  (Doc. 1 ¶¶ 136-37, 139, 143).  According to the Dommels, the "gist of the

action" doctrine does not bar the fraud claim because the fraudulent

misrepresentations are not related to the performance of contractual duties.  (Doc.

114 at 16-18).  Rather, the Bank made the fraudulent misrepresentations as part of a

separate scheme to gain control of the Dommels' assets and destroy the Dommels'

business.  (Id. at 17).  This argument is unpersuasive.

The Bank made the allegedly fraudulent misrepresentations in pursuit of its

rights and remedies under the loan documents.  It is undisputed that the Dommels

and the Bank entered into a contractual relationship by executing three separate

sets of loan documents.  (Doc. 97 ¶¶ 13-14, 22, 24; Doc. 106 ¶¶ 13-14, 22, 24; Doc. 92

¶¶ 19, 21, 39-41, 44-46; Doc. 113 ¶¶ 19, 21, 39-41, 44-46).  Pursuant to those loan documents, the Dommels borrowed over $4,000,000 from the Bank and agreed to repay the loans on certain terms.  When the Dommels were unable to make the required payments, the Bank declared default on all three loans.  (Doc. 97 ¶¶ 42-43; Doc. 106 ¶¶ 42-43; Doc. 92 ¶ 64; Doc. 113 ¶ 64).  In two subsequent forbearance agreements, the Dommels expressly admitted that the Bank was entitled to pursue all rights and remedies under the loan documents and as permitted by law.  (Doc. 92 ¶¶ 71, 86-88; Doc. 113 ¶¶ 71, 86-88).  Such rights and remedies include foreclosure upon the properties and any other necessary action to protect its interest under the promissory notes or security documents.  (See, e.g., Doc. 92-2, Ex. J at 54).  Should the Dommels fail to pay taxes, the loan documents expressly provide that the Bank has the right to pay the taxes and to add the cost to the outstanding debt.  (See id. at 31, 36-38).  Thus, the loan documents clearly contemplate loan default proceedings and acquisition at tax sale.

The Dommels' fraud claim is nuanced; it is not based on the Bank's failure to comply with its contractual duties.  (See Doc. 114 at 17).  Rather, the gravamen of the fraud claim is that the Bank fraudulently misrepresented its intention to pursue its contractual rights and remedies.  Accordingly, the court must ascertain whether the Bank was required to provide the Dommels notice of its intention to pursue those rights and remedies.  The court can only answer this question by reference to the loan documents, which is the quintessential mode of analysis for a breach of contract claim.  Thus, the fraud claim is plainly linked to the contracts between the

parties and is therefore barred by the "gist of the action" doctrine.  See Penn City

Invs., Inc. v. Soltech, Inc., No. 01-5542, 2003 WL 22844210, at *4 (E.D. Pa. Nov. 25,

2003) (dismissing fraud claims when "they are either directly addressed by the

contract, or so closely related to the contractual relationship, that the dispute

between the parties should be resolved by exclusive reference to contractual

principles"); see also Reginella Constr. Co., 949 F. Supp. 2d at 615-16 (holding that

the "gist of the action" doctrine barred tort claim when the parties in fact disputed

the rights and remedies permitted by the indemnity and bond agreements).

### 2.    *Count VII - Negligence*

With respect to the negligence claim, the Dommels allege that, "when JBT

provided financing to the Dommels under the First, Second and Third Notes, it

owed a duty to the Dommels to follow standard banking protocols and procedures

relating to the administration [of] those loans."  (Doc. 1 ¶ 145).  Based on the plain

language of the Complaint, the Dommels seek to hold the Bank liable for negligence

based solely on the breach of a duty created by the loan documents.  The "gist of

the action" doctrine clearly bars the negligence claim on this basis.

The Dommels also argue that the Bank is subject to two independent duties

of care—one applicable to bank directors and one for conducting business under

Section 552 of the Restatement (Second) of Torts.  (Doc. 114 at 25-32; Doc. 142-9 at

13-14).[21]  The Dommels cite to Davis v. First Nat'l Bank of W. Chester, 43 Pa. D. &

---

[21] The Dommels initially failed to raise the Section 552 argument in its rule 56
filings.  By order dated June 10, 2014 (Doc. 156), the court agreed to consider the

C. 3d 211 (Pa. Ct. Com. Pl. 1984), which imposes upon bank directors a general duty

of "diligence, care, and skill which ordinarily prudent men would exercise under

similar circumstances in like positions." Id. at 217.  The Supreme Court of

Pennsylvania has stated that standard of care for bank directors is less strict than

the standard of care for a fiduciary relationship; bank directors are generally liable

only for actions closer to fraud, or gross negligence amounting to fraud.  Selheimer

v. Manganese Corp., 224 A.2d 634, 641 (Pa. 1966).  Section 552, on the other hand,

imposes a duty to supply truthful information to others in the course of business.

More specifically, Section 552 states that:

> "One who, in the course of his business, profession, or employment, or
> in any other transaction in which he has a pecuniary interest, supplies
> false information for the guidance of others in their business
> transactions, is subject to liability for pecuniary loss caused to them by
> their justifiable reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or communicating the
> information."

RESTATEMENT (SECOND) OF TORTS § 552(1).  This duty applies to banks as well as

their agents.  See Baker v. Cambridge Chase, Inc., 725 A.2d 757, 770 (Pa. Super. Ct.

1999).

For purposes of the motions for summary judgment, the court need not

decide the precise contours of the Bank's duty of care because, in the instant

matter, the negligence claim is inextricably intertwined with the parties'

---

Dommels' opposition to the Bank's motions *in limine* in the context of the instant
motions for summary judgment.  These opposition briefs incorporate the Section
552 argument.

contractual obligations.  Indeed, the duty of care would not arise but for the
contractual relationship between the Dommels and the Bank.  Similarly, each of the
purported acts of negligence, such as the Bank's failure to credit equity and its
misrepresentations regarding the tax sale, stems from the contractual relationship.
See, e.,g., Jones v. ABN Amro Mortg. Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010)
(affirming dismissal of negligence claim because claim based on non-performance
of contractual duty to properly credit payments against the mortgages); Strausser v.
PRAMCO, III, 944 A.2d 761, 767-68 (Pa. Super. Ct. 2008) (holding that assurances
related to loan refinancing and holding insurance check "are directly related to the
underlying contractual rights and obligations of the parties as defined by the loan
agreements and mortgages between them").  Therefore, the "gist of the action"
doctrine bars the negligence claim in its entirety.[22]

### E.    Count X - Promissory Estoppel

In Count X, the Dommels seek to hold the Bank liable under the doctrine of
promissory estoppel for inducing the Dommels to not attend the upset tax sale
based upon the Bank's alleged misrepresentations.  (Doc. 1 ¶¶ 154-64).  Under
Pennsylvania law, promissory estoppel allows the court to enforce promises without
consideration when "(1) the promisor makes a promise that he reasonably expects
to induce action or forbearance by the promisee, (2) the promise does induce action

---

[22] Because the court finds that the "gist of the action" doctrine bars the
Dommels' fraud and negligence claims, the court need not address the parties'
argument on the economic loss doctrine or the merits of each claim.

or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise." Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (citing Cardamone v. Univ. of Pittsburgh, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978)). However, promissory estoppel applies only to promises not supported by consideration or, in other words, where there is no binding contract. Constar, Inc. v. Nat'l Distribution Ctrs., Inc., 101 F. Supp. 2d 319, 323 (E.D. Pa. 2000); see also Ferguson v. Kemper, No. 1:12-CV-01993, 2013 WL 594022, at *6 (M.D. Pa. Feb. 15, 2013) ("[W]here an enforceable contract exists, courts have found that applying the doctrine of promissory estoppel would be inappropriate.") (citation omitted); Rho v. Vanguard OB/GYN Associates, P.C., No. 98-1673, 1999 WL 228993, at *6 (E.D. Pa. Apr. 15, 1999) ("[W]hen the parties have formed an enforceable contract, 'relief under a promissory estoppel claim is unwarranted.'" (quoting Carlson, 918 F.2d at 416)).

The Bank contends that the existing contracts between the Bank and the Dommels preclude the promissory estoppel claim. (Doc. 93 at 44-45; Doc. 107 at 15). The court agrees. The parties do not dispute that the Dommels entered into three sets of loan documents to borrow over $4,000,000. (Doc. 97 ¶¶ 13-14, 22, 24; Doc. 106 ¶¶ 13-14, 22, 24; Doc. 92 ¶¶ 19, 21, 39-41, 44-46; Doc. 113 ¶¶ 19, 21, 39-41, 44-46). Upon default, the Dommels also executed two forbearance agreements with the Bank, in which the Dommels acknowledged the outstanding loans, default thereunder, and the Bank's ability to pursue any and all rights and remedies as permitted by law. (Doc. 92 ¶¶ 71, 86-88; Doc. 113 ¶¶ 71, 86-88). In accordance with the terms of these

42

agreements, the Bank sought to protect its mortgage interests in Farm Two and recoup its loses by purchasing the property at the tax sale.  The loan documents and forbearance agreements clearly authorized the Bank to exercise its rights and remedies and acquire Farm Two at the tax sale, including provisions for the non-payment of taxes.  (Doc. 92 ¶¶ 22, 71, 88; Doc. 113 ¶¶ 22, 71, 88; see also Doc. 92-2, Ex. J at 31, 36-38).  The court concludes that these provisions sufficiently encompass any non-contractual promises at issue.  Given the existence and applicability of multiple valid contracts, the court will grant summary judgment as to Count X in favor of the Bank and against the Dommels.

### F.     Count XI - Deepening Insolvency

Lastly, the Dommels assert a claim for deepening insolvency based upon the Bank's allegedly fraudulent assurances and misrepresentations regarding the construction of Farm Two, resolution of outstanding debt, and acquisition of Farm Two at the tax sale.  (Doc. 1 ¶¶ 166-72).  In Pennsylvania,[23] "deepening insolvency" is defined as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life."  In re CitX Corp., 448 F.3d 672, 677 (3d Cir. 2006) (quoting R.F. Lafferty & Co., 267 F.3d at 347).  This tort rests upon the theory that even an insolvent corporation can have valuable

---

[23] A cause of action for deepening insolvency has not been formally recognized by Pennsylvania state courts.  Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349 (3d Cir. 2001).  Nevertheless, the Third Circuit has found that "the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury."  Id.

corporate property, but the fraudulent incurrence of additional debt can damage that value by hastening bankruptcy, undermining business relationships, and dissipating corporate assets.  R.F. Lafferty & Co., 267 F.3d at 349-50; Corporate Aviation Concepts, Inc. v. Multi-Serv. Aviation Corp., No. 03-3020, 2004 WL 1900001, at *3 (E.D. Pa. Aug. 25, 2004).  To succeed on a deepening insolvency claim, a plaintiff must demonstrate that the defendant's actions caused the deepening of insolvency.  In re Lemington Home for Aged, 659 F.3d 282, 294 (3d Cir. 2011). Evidence of fraud is necessary to support a claim of deepening insolvency; a claim of negligence is insufficient.  Id.; In re CitX Corp., 448 F.3d at 681.

The Bank argues that there is no evidence that the Bank's representatives caused "fraudulent expansion of corporate debt and prolongation of corporate life." R.F. Lafferty & Co., 267 F.3d at 347.  The court agrees.[24]  The Dommels list several actions allegedly taken by the Bank which expanded the debt and increased insolvency.  (See Doc. 98 at 20-21; Doc. 114 at 35-36).  However, none of these actions establishes deepening insolvency as a matter of law.  First, the alleged failure to produce monthly statements on the Dommels' accounts or documents identifying credits does not demonstrate any fraudulent expansion of debt or prolongation of corporate existence.  At most, such conduct would only give rise to a breach of contract claim for the Bank's failure to comply with the loan documents.

---

[24] Given the court's conclusion that the Bank is entitled to summary judgment on the merits, the court need not address the Bank's additional arguments regarding the timing of the alleged acts and the statute of limitations. (See Doc. 93 at 48-56).

Similarly, the Bank's alleged misrepresentations about its intention to purchase Farm Two at the tax sale do not support a theory of deepening insolvency. There is no evidence that the Bank caused the debt to increase or prolonged corporate life.  Rather, the Bank exercised its rights and remedies under the loan documents and utilized a valuable asset to reduce the outstanding debt.  The Dommels also assert that the Bank fraudulently acquired Farm Two at a markedly reduced price and failed to credit them the full fair market value.  (Doc. 114 at 38). Contrary to the Dommels' assertions, the court finds no evidence in the record that the Bank did not credit the Dommels the fair market value of Farm Two.  (See Doc. 106 ¶ 135).  Thus, the Bank's decision to purchase Farm Two at the upset tax sale did not dissipate corporate assets; instead, the Bank took action to reduce insolvency.

The Dommels further contend that the Bank gave them false assurances during the construction of Farm Two, causing the incurrence of additional loans and, ultimately, insolvency.  Under federal bankruptcy law, insolvency is a financial condition in which a corporation's debts exceed the fair market value of its assets. 11 U.S.C. § 101(32).  Here, the record does not show that the Dommels were insolvent in 2007 prior to the second and third loans.  In fact, the Dommels believed that they would repay the Second Note through the sale and boarding of horses. (Doc. 92 ¶¶ 42-43; Doc. 113 ¶¶ 42-43).  There is no indication of fraudulent conduct on the part of the Bank or its agents at the time of these loan transactions. According to the Third Circuit, "fraud consists in anything calculated to deceive,

45

whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.  It is any artifice by which a person is deceived to his disadvantage." *In re* Lemington Home for Aged, 659 F.3d at 294 (quoting *In re* Reichert's Estate, 51 A.2d 615, 617 (Pa. 1947)).  The mere extension of credit to an insolvent entity without more is insufficient to support a deepening insolvency claim.  See *In re* Global Serv. Grp., LLC, 316 B.R. 451, 458 (Bankr. S.D.N.Y. 2004).  Such loans are simply bad banking; a deepening insolvency claim requires further proof of intentional fraud.  Thus, the Dommels fail to meet their burden of proof with respect to the additional loans.

The Dommels assert that the Bank made false assurances regarding negotiations after declaring default and confessing judgment in order to acquire Farm Two and prevent the Dommels from protecting their property.  The evidence of record shows that the Bank continued negotiations for a viable resolution of the debt for several years and entered into two forbearance agreements.  Contrary to the Dommels' assertions, the Bank undertook a series of actions designed to help salvage the financial viability of the Dommels' farm operations.  Viewing the evidence in the light most favorable to the Dommels, the court cannot find that the Bank's actions were fraudulent, or nor did the Bank cause the expansion of debt or prolongation of corporate life.  Therefore, the court will grant the Bank's motion for summary judgment as to Count XI of the Complaint.

**IV.**   **Conclusion**

For all of these reasons, the court will grant the Bank and Neuin's motions for summary judgment (Doc. 90, 91) and deny the Dommels' motion for summary judgment (Doc. 96).  An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        July 9, 2014