**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOMMEL PROPERTIES, LLC,** : | **CIVIL ACTION NO. 1:11-CV-2316** |
| **LAND OF BELIEVE FARM, INC.,** : | |
| **WILLIAM J. DOMMEL, and** : | **(Chief Judge Conner)** |
| **ROBERT W. DOMMEL,** : | |
| : | |
| **Plaintiffs** : | |
| : | |
| **v.** : | |
| : | |
| **JONESTOWN BANK AND TRUST** : | |
| **COMPANY,** *now known as* JBT, : | |
| **LEBANON COUNTY TAX CLAIM** : | |
| **BUREAU, and SALLIE A. NEUIN,** : | |
| : | |
| **Defendants** : | |

**MEMORANDUM**

This matter is before the court on remand from the United States Court of
Appeals for the Third Circuit. (See Doc. 165). The court's task on remand is to
consider the impact of the Supreme Court of Pennsylvania's intervening decision in
Bruno v. Erie Insurance Co., 106 A.3d 48 (Pa. 2014), on our prior "gist of the action"
analysis. At the court's behest, the parties filed supplemental memoranda debating
Bruno's effect on the Dommels' claims for fraud and negligence. Hence, the issues
on remand are ripe for disposition.

**I.    Factual Background & Procedural History**

The material facts are set forth in the court's July 9, 2014 decision, Dommel
Properties, LLC v. Jonestown Bank & Trust Co., No. 1:11-CV-2316, 2014 WL
3385100, at *1-6 (M.D. Pa. July 9, 2014) ("Dommel I"), familiarity with which is

presumed.  In view of the inquiry on remand, pertinent facts are reiterated and elaborated as appropriate below.

William Dommel ("Dommel") and his late father, Robert Dommel,[1] participated in the commercial horse-breeding business for over twenty-five years. (Doc. 97 ¶ 7; Doc. 106 ¶ 7).  Between March 2006 and May 2007, the Dommels entered into three loan agreements with Jonestown Bank and Trust Company ("the Bank"), totaling approximately $4,330,000.  (Doc. 97 ¶¶ 13-14, 22, 24; Doc. 106 ¶¶ 13-14, 22, 24).  The documents memorializing these agreements consist of promissory notes, mortgages, and guaranties (collectively, "the loan documents"). (See Doc. 92-2, Exs. J, O, P).

The Dommels pledged three properties *in toto* as security for the loans: (1) "Farm One" located at 83 Sherk's Church Road, Palmyra, Pennsylvania, consisting of 96 acres, (2) "Farm Two" located at 7 Coon Creek Road, Palmyra, Pennsylvania, consisting of 68 acres, and (3) a hunting camp located in Lycoming County, Pennsylvania, consisting of 500 acres.  (Doc. 97 ¶ 11; Doc. 106 ¶ 11). According to the terms of each mortgage, the Dommels waived "all notices of Mortgagor's default of, or Mortgagee's election to exercise, or Mortgagee's actual exercise of any right, remedy or option under, this Mortgage or under the Note, unless expressly required under this Mortgage or documents evidencing or collateralizing the Note."  (Doc. 92-2, Exs. J at 38, P at 124).

---

[1] The court dismissed Robert Dommel as a plaintiff pursuant to Federal Rule of Civil Procedure 25(a)(1) by order (Doc. 158) dated July 9, 2014.  FED. R. CIV. P. 25(a)(1).

The Dommels also tendered guaranties to the Bank, wherein plaintiff entities Land of Believe Farm, Inc., a corporation owned by the Dommels, and Dommel Properties, Inc., a limited liability company, agreed to satisfy the Dommels' debt obligations upon occurrence of default.  (Id. Exs. J at 26-28, O at 113-15, P at 138-40). Each guaranty includes the following waiver: "[I]ntending to be legally bound hereby, and to induce LENDER to make this loan to BORROWERS . . . GUARANTOR hereby waives all notices whatsoever with respect to this Guaranty and the Note, including, but not being limited to . . . notice of the LENDER'S intention to act in reliance hereon."  (Id. Exs. J at 26, O at 113, P at 138).

In the event of the Dommels' default, the loan documents authorize the Bank to confess judgment, to foreclose on the properties, and to pursue any and all rights and remedies under the agreements.  (Doc. 92 ¶¶ 22, 44-46; Doc. 113 ¶¶ 22, 44-46). Specifically, the mortgage provision governing the "Rights of Mortgagee After Default" states as follows:

> Upon the occurrence of an Event of Default, Mortgagee shall have the option to declare all of the Liabilities to be immediately due and owing.  Whether or not it elects to accelerate the Liabilities, mortgagee may take any action and exercise any rights and remedies which may be available at law or in equity for the enforcement of this Mortgage or the collection of the Liabilities including, without limitation, foreclosure.

(Doc. 92-2, Exs. J at 38, P at 124).

The Dommels ultimately failed to make their monthly loan payments.  (Doc. 92 ¶¶ 49-50; Doc. 113 ¶¶ 49-50).  On March 11, 2008, the Bank's Board of Directors

("the Board") voted to declare default.  (Doc. 97 ¶¶ 42-43; Doc. 106 ¶¶ 42-43).  The Bank worked with the Dommels thereafter to resolve their substantial outstanding debt obligations.  (Doc. 97 ¶ 45; Doc. 106 ¶ 45).  Unsuccessful in this endeavor, the Bank confessed judgment on the loans in October 2008.  (Doc. 97 ¶ 65; Doc. 106 ¶ 65).

On July 23, 2009, the Bank conducted a sheriff's sale of Farm One in partial execution of the judgment.  (Doc. 97 ¶ 75; Doc. 106 ¶ 75).  The Bank tendered the sole bid of $1.5 million and purchased Farm One for $11,053.31.  (Doc. 97 ¶ 75; Doc. 106 ¶ 75).  The Bank then filed a petition to fix fair market value; following a hearing thereon, the Lebanon County Court of Common Pleas set the fair market value of Farm One at $1.5 million.  (Doc. 92 ¶ 80; Doc. 113 ¶ 80).

The Bank subsequently entered into a one-year forbearance agreement with the Dommels on Farm Two in August 2009.  (Doc. 92 ¶¶ 86-87; Doc. 113 ¶¶ 86-87).  Therein, the Dommels acknowledged their default and reaffirmed the rights and remedies available to the Bank under the loan documents.  (Doc. 92 ¶ 88; Doc. 113 ¶ 88).  The Dommels also agreed to pay the Bank $10,000 per month and to market the hunting camp for sale.  (Doc. 92 ¶ 88; Doc. 113 ¶ 88).  The hunting camp eventually sold for $575,000 in March 2010.  (Doc. 92 ¶ 89; Doc. 97 ¶ 12; Doc. 106 ¶ 12; Doc. 113 ¶ 89).  Following expiration of the forbearance agreement, the Bank scheduled Farm Two for sheriff's sale, to occur in October 2011.  (Doc. 92 ¶ 94; Doc. 113 ¶ 94).

Concomitant with the foregoing default, the Dommels failed to pay property taxes on Farm Two for tax years 2008 through 2010.  (Doc. 92 ¶ 96; Doc. 94 ¶ 18;

Doc. 111 ¶ 18; Doc. 113 ¶ 96).  The Lebanon County Tax Claim Bureau scheduled a tax sale of Farm Two for September 12, 2011 to recover delinquent taxes against the property.  (Doc. 92 ¶ 99; Doc. 113 ¶ 99).

The parties' accounts of events circumambient to the tax sale diverge considerably.  On September 9, 2011, Dommel met with the Bank's Senior Vice President of Lending, Roger Jeremiah ("Jeremiah"), and tendered a $5,000 check to the Bank.  (Doc. 97 ¶ 98; Doc. 106 ¶ 98).  Dommel testified that during the meeting Jeremiah assured him that the Bank would not bid on Farm Two at the tax sale. (Doc. 92-1, Ex. B, Dommel Dep. 146:24-147:4, 198:2-198:8, July 29, 2013 ("Dommel Dep.")).  Thereafter, Dommel called the Bank's Vice President of Commercial Lending, Richard Rollman ("Rollman").  (Doc. 97 ¶ 103).  Dommel inquired "whether the Bank would buy the property," to which Rollman purportedly replied, "I'm not sure how that would happen."  (Id.; Doc. 106 ¶ 103).  According to the Dommels, "Rollman believed . . . Dommel was making the $5,000 payment as part of a workout scenario with the Bank to resolve the Dommels' outstandi[n]g indebtedness."  (Doc. 97 ¶ 99).  The Dommels contend that they did not attend the tax sale based on their communications with the Bank. (Id. ¶ 109).

Counterpoising the Dommels' representations, Jeremiah testified in his deposition as follows:

> A:    I accepted the check.  I gave [Dommel] a letter stating that we would accept the check, but it didn't change our relationship at all, that it was not part of any agreement.
>
> Q:    Did you tell Mr. Dommel that the bank wouldn't bid at the tax sale?
>
> A:    I did not.

(Doc. 92-1, Ex. F, Jeremiah Dep. 89:6-89:12, Aug. 14, 2013 ("Jeremiah Dep.")).  The letter from the Bank (1) stated that the $5,000 payment did not appertain to any agreement and (2) expressly reserved the Bank's right to pursue its remedies under the loan documents.  (Doc. 92 ¶ 104; Doc. 106 ¶ 98; see Doc. 113 ¶ 104).  Dommel denies receiving the letter yet concedes that the Bank emailed a copy to his counsel on September 9, 2011, the date of the meeting.  (Doc. 92 ¶¶ 104-05; Doc. 113 ¶¶ 104-05).

Rollman testified that, during his telephone conversation with Dommel, he expressed doubt as to whether the Bank would purchase Farm Two because "attorneys were still researching things" and the matter "was still . . . undecided." (Doc. 92-1, Ex. E, Rollman Dep. 151:5-152:10, Aug. 14, 2013 ("Rollman Dep."); see Doc. 106 ¶ 103).  Rollman explained that "[t]he Bank [had] decided that if the opportunity presented itself and . . . it made sense," it would bid on Farm Two at the tax sale.  (Rollman Dep. 152:6-152:10).  Rollman also testified that at no point in

time did he perceive Dommel's $5,000 payment to be part of a debt workout agreement.  (Rollman Dep. 137:18-138:25).

The Bank entered the sole bid at the tax sale and purchased Farm Two for $110,401.95.  (Doc. 97 ¶¶ 111, 115; Doc. 106 ¶¶ 111, 115).  According to the Dommels, Jeremiah informed Dommel that the Board made its decision to buy Farm Two during the weekend immediately preceding the sale, subsequent to September 9, 2011.  (Doc. 97 ¶¶ 117-19).  The Bank counters that Jeremiah made no such representation to Dommel and asserts that the Board voted to acquire Farm Two at an earlier meeting.  (Doc. 106 ¶¶ 117-18).  The minutes from an August 30, 2011 Board meeting corroborate the Bank's position regarding the timing of the Board's decision.  (Doc. 94-1, Ex. 11 at 134).

On September 28, 2011, Rollman contacted the Dommels' largest client, Tom McClay ("McClay"), by letter on behalf of the Bank, representing that the Bank was the current owner of Farm Two.  (Doc. 97 ¶¶ 124-26; Doc. 106 ¶¶ 124-26).  According to the Bank, Rollman believed that the Bank acquired ownership at the tax sale upon paying the taxes and securing insurance, even prior to the deed transfer. (Doc. 106 ¶ 126).

The Dommels claim that, for the duration of the above-referenced period, the Bank failed to produce monthly statements reflecting the Dommels' loan payments and failed to apply certain credits to the Dommels' outstanding debt. (Doc. 97 ¶¶ 131-35; Doc. 113 ¶¶ 153, 159-62).  The Bank categorically denies these contentions.  The Bank asserts that the Dommels received monthly statements showing their account number, account balance, and current payments due,

as well as documents identifying relevant credits.  (Doc. 92 ¶¶ 153, 159-62; Doc. 106 ¶¶ 131-35; <u>see</u> Doc. 106-1, Ex. C).  These credits included $1.5 million, the fair market value of Farm One on the date of the sheriff's sale; $530,201.64, the purchase price of the hunting camp; and $1,388,207, the fair market value of Farm Two. (Doc. 92 ¶¶ 160-62; Doc. 106 ¶ 135).

In a memorandum opinion dated July 9, 2014, the court granted summary judgment in favor of the Bank, concluding that Pennsylvania's gist of the action doctrine bars the Dommels' fraud and negligence claims.[2]  <u>See</u> <u>Dommel I</u>, 2014 WL 3385100, at *16-18.  The Dommels timely appealed.  (<u>See</u> Doc. 162).  During the pendency thereof, the Supreme Court of Pennsylvania expounded upon the gist of the action doctrine for the first time in <u>Bruno v. Erie Insurance Co.</u>, 106 A.3d at 60-70.  Observing that <u>Bruno</u> may alter the court's prior decision, the Third Circuit vacated our order (Doc. 158) as to the Dommels' fraud and negligence claims and remanded to afford the court "the opportunity to conduct its analysis under <u>Bruno</u>."  <u>Dommel Props. LLC v. Jonestown Bank & Trust Co.</u>, No. 14-3564, 2015 WL 5438847, at *4 (3d Cir. Sept. 16, 2015) (nonprecedential) ("<u>Dommel II</u>").

---

[2] The court also granted summary judgment in favor of defendant Sallie A. Neuin ("Neuin"), Lebanon County Treasurer, on the remaining claims against her. <u>See</u> <u>Dommel I</u>, 2014 WL 3385100, at *8-11.  The Third Circuit's remand does not disturb this judgment.  Additionally, by memorandum and order (Doc. 64) dated March 19, 2013, the court dismissed all claims against defendant Lebanon County Tax Claim Bureau.

## II.   **Jurisdiction & Legal Standard**

The court exercises supplemental jurisdiction over the instant matter. See 28 U.S.C. § 1367.  Specifically, the court retains its jurisdiction over the Dommels' state-law claims "based on considerations of judicial economy, convenience[,] and fairness to the litigants."  Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009) (citations omitted).

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Federal Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720

(3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)); see also Allah v. Ricci, 532 F. App'x 48, 50 (3d Cir. 2013) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987)).

## III.   Discussion

Under Pennsylvania law, the gist of the action doctrine bars tort claims when "the true gravamen, or, gist, of the claim sounds in contract."  Dommel II, 2015 WL 5438847, at *2.  The question posed by the Third Circuit on remand is whether Bruno's formulation of the gist of the action doctrine precludes the Dommels' claims for fraud and negligence.  Id. at *4.  The court will first examine the guiding principles announced by the Supreme Court of Pennsylvania therein.

### A.   *Bruno*'s Elucidation of the Gist of the Action Doctrine

In Bruno, David and Angela Bruno ("the Brunos") purchased a homeowners insurance policy from Erie Insurance Company ("Erie").  106 A.3d at 51.  The terms of the policy required Erie to inspect the Brunos' home for mold and to pay up to $5,000 for necessary mold removal costs.  Id.  The Brunos developed myriad infirmities after Erie's inspectors incorrectly opined that mold discovered in the walls of the Brunos' home was harmless.  Id. at 52.  The Brunos thereafter brought claims for negligence against Erie, asserting, *inter alia*, that the company misled them concerning the nature of the mold infestation and minimized the danger of the situation when it knew or should have known otherwise.  Id. at 52-53.  The trial

court dismissed the Brunos' claims as barred by the gist of the action doctrine, and the Superior Court of Pennsylvania affirmed.  Id. at 53.

The Supreme Court of Pennsylvania reversed, finding that the Brunos' allegations concerned a "breach of a social duty imposed by the law of torts, and not a breach of a duty created by the underlying contract."  Id. at 50-51.  The Supreme Court of Pennsylvania explained that the Brunos accused Erie of negligence *in the course of* performing its contractual duties; the Brunos did not, however, assert that Erie failed to inspect their home for mold or failed to pay $5,000 for mold removal, as required under their policy.  Id. at 70.  Following a comprehensive exposition of Pennsylvania gist of the action jurisprudence, the Supreme Court of Pennsylvania concluded that "the critical determinative factor" is "the nature of the duty alleged to have been breached."  Id. at 68.  It distinguished claims sounding in tort from those sounding in contract as follows:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. . . . If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

Id.  The Supreme Court of Pennsylvania noted that the pleadings control the inquiry at the motion to dismiss stage, whereas "in subsequent contexts . . . the facts . . . should be viewed in accordance with the applicable standard of review."  Id. at 68 n.15.

Of particular relevance to the matter *sub judice*, <u>Bruno</u> limited the precedential value of the prevailing gist of the action case, <u>eToll, Inc. v. Elias/Savion Advertising, Inc.</u>, 811 A.2d 10 (Pa. Super. Ct. 2002).  <u>See</u> <u>Bruno</u>, 106 A.3d at 66-67, 69 n.17.  In <u>eToll</u>, the Superior Court of Pennsylvania affirmed summary judgment on plaintiff's tort claims for fraud in the performance of a contract, finding the claims to be "inextricably intertwined" with plaintiff's related breach of contract claims.  811 A.2d at 21.  The court held that the gist of the action doctrine bars a tort claim when (1) the claim arises from a contract between the parties; (2) the duties breached are created by the contract; (3) liability derives from the contract; or (4) the success of the tort claim is wholly dependent upon the contract's terms. <u>See</u> <u>id.</u> at 19.  The provenance and substance of <u>eToll</u>'s holding pervades numerous federal and state court opinions, including this court's prior decision in the instant case.  <u>See</u> <u>Dommel I</u>, 2015 WL 5438847, at *16; <u>see, e.g.</u>, <u>Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.</u>, 602 F.3d 541, 548-50 (3d Cir. 2010); <u>Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.</u>, 256 F. Supp. 2d 329, 340-44 (E.D. Pa. 2003); <u>J.J. DeLuca Co. v. Toll Naval Assocs.</u>, 56 A.3d 402, 413-16 (Pa. Super. Ct. 2012).

Addressing <u>Bruno</u>'s treatment of <u>eToll</u>, the Third Circuit submits the following observation on remand:

> While the <u>Bruno</u> court did not explicitly overrule <u>eToll</u> or its progeny, it explained that <u>eToll</u> creates a divide in the gist of the action jurisprudence, did not rely on any of the <u>eToll</u> factors in reaffirming the duty-based standard from which <u>eToll</u> departs, and cabined reliance on <u>eToll</u>'s "inextricably intertwined" language.

Dommel II, 2015 WL 5438847, at *3.  With fidelity to the Third Circuit's analysis, the court will proceed to reevaluate the Dommels' claims using the duty-based inquiry elucidated in Bruno.

### B.  Application of *Bruno*'s Duty-Based Paradigm

Following Bruno's directive, the court must first distill the apposite facts of record in accordance with the standard of review governing summary judgment. See Bruno, 106 A.3d at 68 n.15.  Federal Rule of Civil Procedure 56(c) requires movants and nonmovants alike to support factual assertions by "citing to particular parts of materials in the record" or otherwise "showing that the materials cited do not establish the absence or presence of a genuine dispute."  FED. R. CIV. P. 56(c).  The Local Rules of Court undergird this principle by requiring Rule 56 motions to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  The Local Rules also require the party opposing summary judgment to file a responsive statement identifying genuine issues to be tried and mandate that both parties' submissions "include reference to the parts of the record that support the statements."  Id.  Consistent with Federal Rule 56, the Local Rules allow a court to deem a moving party's statement to be admitted when it is not properly "controverted by the statement required to be served by the opposing party."  Id.; see Thomas v. United States, 558 F. Supp. 2d 553, 558-59 (M.D. Pa. 2008).

In Count VII of the complaint, the Dommels assert that the Bank fraudulently represented its intentions toward Farm Two at the tax sale to induce

the Dommels not to protect their property interests.  (Doc. 1 ¶¶ 135-43).  The Dommels further allege in Count VIII that the Bank negligently breached a duty to comply with standard banking protocols and procedures in connection with the loan transactions and thereby caused the Dommels to lose their property. (Id. ¶¶ 144-47).  Specifically, the Dommels aver that the Bank negligently (1) used confidential, proprietary information obtained pursuant to the loan agreements to destroy the Dommels' business; (2) failed to produce monthly statements reflecting the Dommels' loan payments; (3) failed to apply certain credits to the Dommels' outstanding debt; (4) misrepresented its intent to bid on Farm Two at the tax sale; (5) agreed at a Board meeting to "reject all bids by other purchasers and acquire Farm Two for itself;" (6) unlawfully threatened McClay, the Dommels' largest client; (7) unlawfully threatened Dommel; and (8) illegally marketed Farm Two to potential buyers.  (Id. ¶ 146).

The Bank moves for summary judgment herein, riposting that the Dommels fail to controvert the Bank's evidence or otherwise support their allegations of fraud and negligence.  (Doc. 93 at 36-43; Doc. 174 at 4 n.4).  For clarity of analysis, the court will first consider the Dommels' claim for negligence, excepting assertions concerning the tax sale.  The court will thereafter address the fraud claim in tandem with the Dommels' factually equivalent negligence averments.

The Bank proffers the following evidence to disprove the Dommels' allegations in Count VIII: (1) loan documents and forbearance agreements wherein the Dommels agreed to provide the Bank with confidential information as required to execute each such agreement, (Doc. 92-2, Ex. J; see Doc. 93 at 41); (2) monthly

statements showing the Dommels' account number, account balance, and current payments due, (Doc. 106-1, Ex. C; <u>see</u> Doc. 92 ¶¶ 153, 159-62; Doc. 106 ¶¶ 131-35); and (3) affidavits submitted by Rollman stating the equity amounts credited against the Dommels' debt, (Doc. 92-2, Ex. H; <u>see</u> Doc. 93 at 42). Further, the Bank posits that the Dommels have set forth no evidence in support of their assertions that the Bank endeavored to destroy the Dommels' business using proprietary information; determined to reject all offers to purchase Farm Two; unlawfully threatened McClay and Dommel; and illegally marketed Farm Two for sale. (Doc. 93 at 43; Doc. 174 at 4 n.4).

In response, the Dommels cite deposition testimony of Jeremiah, Rollman, McClay, Neuin, and Denise McHenry ("McHenry"), Dommel's former wife, without elucidating how the myriad statements therein lend support to their claims. (Doc. 114 at 26-32; <u>see</u> Doc. 92-2, Exs. E, F, Q; Doc. 92-3, Ex. KK; Doc. 97-8, Ex. G). The Dommels otherwise point the court to the complaint, the Bank's answer, a loan presentation sheet, and a log documenting Rollman's telephone calls. (Doc. 114 at 27-28; <u>see</u> Doc. 1; Doc. 66; Doc. 113-7, Ex. G). Even envisaged in the light most favorable to the Dommels, the cited testimony and exhibits neither counter the Bank's evidence nor bolster the Dommels' pleadings.

For example, to demonstrate the Bank's "failure to provide accurate loan accounting records or bills," the Dommels refer the court to Jeremiah's representation that he emailed Rollman the following instructive: "It's not your responsibility to provide accurate loan accounting or bills." (Doc. 114 at 26; Jeremiah Dep. 31:4-31:13). The Dommels fail to cite the immediately consecutive

15

lines of the deposition transcript, wherein Jeremiah clarifies that he also advised Rollman: "That's a loan department responsibility." (Jeremiah Dep. 31:14-31:15). Further, in support of the Dommels' assertion that the Bank "fail[ed] to produce any monthly statements on the Dommels' accounts showing . . . the loans to which payments were applied," the Dommels refer the court to excerpts from testimony provided by McHenry and Rollman. (Doc. 114 at 26). McHenry states that she does not recall receiving monthly statements from the Bank, explaining as follows: "To the best of my knowledge there wasn't any because I never saw anything come to the farm, unless it went somewhere else." (Doc. 97-8, Ex. G, McHenry Dep. 26:4-26:9, Oct. 29, 2013). Rollman asserts, however, that the Bank sent monthly statements to the Dommels via email, which included prior payment history. (Rollman Dep. 171:11-173:7). The balance of the record citations yield comparable results. This *sub rosa* briefing tact is unavailing.

Additionally, to show that the Bank misused confidential information to destroy their business, the Dommels offer broad, conspirative theories but do not point the court to any evidence of record. (See Doc. 114 at 30). Rule 56 requires the Dommels to submit evidence in support of their claims and to demonstrate that genuine disputes of fact remain for trial. FED. R. CIV. P. 56(e). Mere allegations, conjecture, and suspicion do not suffice. See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)); Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Quite simply, the Dommels fail to controvert the Bank's cited evidence and statements of material fact

pertaining to various negligence averments.  FED. R. CIV. P. 56(c); LOCAL RULE OF

COURT 56.1; see Thomas, 558 F. Supp. 2d at 558-59.  After careful scrutiny, the court

concludes that the record is otherwise devoid of *probata* in support of the Dommels'

*allegata*.  Thus, notwithstanding their factual assertions regarding the tax sale, the

Dommels' allegations of negligence, as articulated in the complaint, will not survive

summary judgment.

With respect to the tax sale, the Bank asserts that the Dommels have

"produced no evidence whatsoever to create a factual dispute."  (Doc. 93 at 42).  On

the present record, the court must disagree.[3]  Dommel testified that on September

9, 2011, Jeremiah represented that the Bank would not bid on Farm Two.  (Dommel

Dep. 146:24-147:4, 198:2-198:8).  Jeremiah's testimony directly contradicts Dommel's

account.  (Jeremiah Dep. 89:6-89:12).  However, Rollman and Dommel concur that

when Dommel asked "whether the Bank would buy the property," Rollman replied

that he was "not sure how that would happen."  (Doc. 97 ¶ 103; Doc. 106 ¶ 103).

Rollman testified that during this conversation, he was in fact aware that the

Bank contemplated tendering a bid at the upcoming tax sale.  (Rollman Dep.

151:5-152:25).  Considered in the light most favorable to the Dommels, the court

finds that the evidence *in extenso* tends to establish that the Bank decided to bid on

Farm Two prior to the tax sale and subsequently withheld this information from the

---

[3] The Bank is correct as to one ancillary disputed fact.  Despite their entreaty to the contrary, the Dommels have presented no evidence to support their conclusion that the Bank perceived Dommel's $5,000 check to be associated with any agreement between the parties.  (See Doc. 97 ¶ 99).  The Bank's reservation of rights letter, which it emailed to Dommel's counsel forthwith, unambiguously establishes otherwise.  (See Doc. 92 ¶¶ 104-05; Doc. 113 ¶¶ 104-05).

Dommels.  Consequently, the court is compelled to perform the duty-based inquiry counseled by <u>Bruno</u> to determine whether the Dommels' claims for fraud and negligence will survive summary judgment.

The Dommels argue on remand that their tort claims are not proscribed by the gist of the action doctrine.  (Doc. 171 at 13-20).  The Dommels rely on two alternative theories in support of their position.  First, citing <u>Bruno</u>, the Dommels assert that their claims are "not grounded upon a contract between the parties or any duties owed thereunder."  (<u>Id.</u> at 14).  The Dommels assert alternatively that the loan documents merged into the confessed judgments entered by the Bank in October 2008, extinguishing any originally existing duties.  (<u>Id.</u> at 13 n.6).  *Per contra*, the Bank contends that the Dommels' claims remain barred by the gist of the action doctrine because the Bank's allegedly tortious acts were expressly authorized by the loan documents.  (Doc. 170 at 11).  To resolve this dispute, we must examine and expand upon the precise parameters of <u>Bruno</u>'s gist of the action formulation.

As detailed *supra*, <u>Bruno</u> establishes that whether a claim sounds in contract or tort is dependent upon "the nature of the duty alleged to have been breached." 106 A.3d at 68.  A duty is either "one created by the parties by the terms of the[] contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do" or "a broader social duty owed to all individuals . . . [and] exist[ing] regardless of the contract."  <u>Id.</u>  The court notes two analytical paradigms which <u>Bruno</u> uses to clarify this query.  First, <u>Bruno</u> contrasts negligent actions undertaken *in the course* of performing contractual obligations with acts

directly pursuant to the terms of the contract.  Id. at 70-71.  Compare Krum v.

Anthony, 8 A. 598 (Pa. 1887), with Bash v. Bell Tel. Co., 601 A.2d 825 (Pa. Super. Ct.

1992).  Second, Bruno differentiates between contracts that "merely serve[] as the

vehicle" that establishes the parties' relationship and agreements which define

later-contested obligations.  106 A.3d at 70-71.

   In delineating these principles, Bruno illuminates the duty-based distinction

extant throughout Pennsylvania's gist of the action jurisprudence.  Id. at 60-70.

Bruno relies most pellucidly on Bash v. Bell Telephone Co., 601 A.2d 825 (Pa.

Super. Ct. 1992), distinguishing the "more straightforward analysis set forth"

therein with the "inextricably intertwined" standard employed in eToll.  Bruno,

106 A.3d at 67.  In Bash, the Superior Court of Pennsylvania annunciated a

duty-based test and defined contract claims as those which encompass duties

"imposed by mutual consensus agreements between particular individuals."

601 A.2d at 830 (quoting Iron Mountain Sec. Storage Corp. v. Am. Specialty

Foods, Inc., 457 F. Supp. 1158, 1165 (E.D. Pa. 1978)).  Application of the foregoing

precepts to the facts of the instant action yields a single conclusion, to wit: the duty

advanced by the Dommels is contractual in nature.

   Culled to their essence, the Dommels' tort claims charge the Bank with

obscuring its intent to bid on Farm Two at the tax sale.  Stated differently, the

Dommels assert that the Bank contravened a duty to provide notice, upon request,

of its intent to exercise its remedies under the loan agreements.  The facts of

record demonstrate that the Bank bargained to be released from any such

obligation.  Indeed, the Dommels expressly waived "notice[] of . . . [the Bank's]

election to exercise . . . any right, remedy or option under" the loan agreements. (Doc. 92-2, Exs. J at 38, P at 124).

The court underscores the distinction between the claims at issue, on the one hand, and the allegations in <u>Bruno</u> and the Pennsylvania cases undergirding its holding, on the other.  Herein, the duty alleged to have been breached is addressed, defined, and waived—as opposed to "created"—by the contract. <u>See</u> <u>Bruno</u>, 106 A.3d at 68.  The Bank did not violate a term set forth in the loan documents, nor did it act negligently in the course of performing a contractual obligation.  <u>See id.</u> at 70-71.  Cases predating <u>Bruno</u> which might otherwise shed light on the court's inquiry rely on <u>eToll</u>'s "inextricably intertwined" standard, rendering them inapposite.  <u>See, e.g.</u>, <u>Reginella Constr. Co. v. Travelers Cas. & Sur. Co. of Am.</u>, 949 F. Supp. 2d 599, 615 (W.D. Pa. 2013).  Nonetheless, upon careful consideration of the principles expounded in <u>Bruno</u>, the court concludes that the nature of the duty alleged to have been breached in this action is contractual.

As stated in <u>Bash</u> and recited in <u>Bruno</u>, the Dommels' tort claims are grounded in a duty addressed "by mutual consensus agreements between" the parties.  <u>Bruno</u>, 106 A.3d at 68; <u>Bash</u>, 601 A.2d at 830.  Further, the loan agreements are more than a mere conduit for the relationship between the Dommels and the Bank; the parties' duties attendant to the occurrence of default are carefully prescribed therein and bear directly on the Bank's actions preceding the tax sale.  <u>See Bruno</u>, 106 A.3d at 70-71.  Specifically, and explicitly, the Bank may "exercise any rights and remedies which may be available at law or in equity for the enforcement of [the mortgage] or the collection of the [l]iabilities

including . . . foreclosure" without notifying the Dommels of its intent to do so. (Doc. 92-2, Exs. J at 38, P at 124).  Hence, the loan agreements squarely absolve the Bank of the obligation to inform the Dommels of its projected course following default; actions taken pursuant to these contractual terms cannot form the basis of independent tort claims.

To hold otherwise would emasculate an oft critical contract term, allowing tort claims for failure to provide notice that parties have otherwise agreed to waive. As the Third Circuit has observed, "Blurring the bright line between tort and contract could diminish confidence in the value of the negotiated instrument and deter private parties from entering into contracts." Pediatrix Screening, Inc., 602 F.3d at 548.  In light of the Dommels' contractual approbation of the very conduct underlying their tort claims, the court concludes that the *ratio decendi* in Bruno forestalls the Dommels' claims.

Lastly, the court finds the Dommels' secondary argument to be meritless; the Dommels cite Lance v. Mann, 60 A.2d 35 (Pa. 1948), for the proposition that contract terms merge into a confessed judgment.  (Doc. 171 at 13 n.6).  However, Lance addresses Pennsylvania's merger doctrine, which bars litigants from pursuing additional remedies after final judgment has been rendered.  Lance, 60 A.2d at 36; see, e.g., DePue v. Workers' Comp. App. Bd., 61 A.3d 1062, 1067 (Pa. Commw. Ct. 2013).  Moreover, it is well-established that confessed judgment on a promissory note does not "extinguish the independent provisions of" related agreements.

*In re* Stendardo, 991 F.2d 1089, 1097 (3d Cir. 1993).  The Dommels' argument misses the mark entirely.  Accordingly, the Bank is entitled to judgment as a matter of law with respect to the Dommels' claims for fraud and negligence.

**IV.**     **Conclusion**

The court will grant the Bank's motion (Doc. 91) for summary judgment, and deny the Dommels' motion (Doc. 96) for partial summary judgment.  An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:       February 22, 2016